UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

WILLIAM P. CASTILLO,

    Petitioner,

      v.

WILLIAM GITTERE, *et al.*,

    Respondents.

Case No. 2:04-cv-00868-RCJ-GWF

Order

Introduction

    This action is a petition for a writ of habeas corpus by William P. Castillo, a Nevada prisoner sentenced to death. The claims remaining in Castillo's second amended habeas petition are before the Court for adjudication on their merits. The Court will dismiss, without prejudice, part of one of Castillo's remaining claims, will deny Castillo habeas corpus relief on his other remaining claims, and will grant Castillo a certificate of appealability with respect to two claims.

Background Facts and Procedural History

    In its order affirming the judgment of conviction in Castillo's case, the Nevada Supreme Court described the facts underlying this case, as follows:

> In late November 1995, appellant William Patrick Castillo held a job as a roofer in Las Vegas. Harry Kumma, a former co-worker, contacted Castillo and two other roofing employees, Kirk Rasmussen and Jeff Donovan, about completing a side job. The side job involved re-roofing the residence of the victim, Isabelle Berndt.
>
> Kumma, Rasmussen, Donovan, and Castillo worked on Berndt's roof on November 25, 1995. While performing ground cleanup at Berndt's residence, Castillo indicated to Donovan that he found a key to Berndt's home and wanted to enter. Donovan told Castillo that he should not and

1

directed Castillo to return the key to the place where he found it. In response, Castillo stated "I'll just come back later at nighttime."

At some time during the roofing job, Castillo asked Kumma to lend him $500 so that Castillo could pay his lawyer for services rendered in connection with an unrelated criminal battery charge. Kumma did not lend Castillo the money.

Prior to these events, Castillo began residing with his girlfriend, Tammy Jo Bryant, and a friend, Michelle Platou. At about 6:00 p.m. on December 16, 1995, Castillo left the apartment with Platou in Platou's car. The two returned to the apartment at approximately 3:00 a.m. on the morning of December 17, 1995, with a VCR, a box containing silverware, and a bag containing knit booties. A few minutes later, Castillo and Platou again departed. They returned about twenty minutes later.

At about 9:00 or 10:00 a.m. on December 17, 1995, Castillo and Platou allegedly informed Bryant that they had committed a robbery and stolen several items. According to Bryant, Castillo and Platou further informed her that while in the house, Platou inadvertently bumped into a wall and made some noise. Castillo and Platou allegedly told Bryant that Castillo then hit a sleeping person with a tire iron Castillo brought into the house. The two then departed the scene. According to Bryant, they further stated that, out of fear that they left incriminating fingerprints on the wall of the house, they returned to the residence at 3:00 a.m. to burn down the house.

In the early morning hours of December 17, 1995, neighbors notified the police that Berndt's residence was ablaze. Firefighters found Berndt's body inside the house. An arson investigator determined that two independent fires, set by "human hands," using some type of accelerant, caused the blaze. Investigators found a charred bottle of lighter fluid at the scene and several spots in the living room where an accelerant was present. Laboratory tests confirmed these findings.

According to the coroner's autopsy report, Berndt suffered "multiple crushing-type injuries with lacerations of the head, crushing injuries of the jaws," and several broken teeth. Berndt also had deep lacerations on the back of the head and injuries to the face and ears. According to the coroner, all injuries were contemporaneous. The coroner testified that Berndt died as a result of an intracranial hemorrhage due to blunt force trauma to the face and head. The coroner further testified that these injuries were consistent with blows from a crowbar or tire iron.

A Las Vegas Metropolitan Police Department crime analyst investigated Berndt's residence and observed fire, smoke and water damage in the living room, kitchen and master bedroom. He noted that dresser drawers had been opened, two jewelry boxes had been opened, and the house had been "ransacked." The crime analyst also observed blood marks on the wall next to Berndt's body, which was found lying on a bed.

On December 17, 1995, Berndt's only child, Jean Marie Hosking, arrived at Berndt's residence. She searched the house and determined that her mother's silverware was missing. This silverware featured a

distinctive floral pattern, had an engraved "B" on each piece, and was stored in a wooden box on the shelf in Berndt's bedroom. Also missing were a VCR, Christmas booties Berndt was knitting for her grandchildren, and eight $50 U.S. savings bonds.

On December 19, 1995, Rasmussen, one of Castillo's coworkers, contacted the police. According to Rasmussen, during the carpool to work on December 18, 1995, Castillo said, "This weekend I murdered an 86-year-old lady in her sleep." Castillo also allegedly stated that he entered Berndt's house with the intent to steal Berndt's valuables, hit Berndt numerous times with a tire iron, and heard her "gurgling" in her own blood, before he put a pillow over her head to smother her. Castillo also allegedly told Rasmussen that he had stolen a VCR, money, and silverware and that he intended to sell these items to raise money to pay his attorney.

The following morning, Castillo allegedly told Rasmussen that the crime had been reported on the news. On December 19, Rasmussen drove by Berndt's residence, saw that it had been burned, and contacted the police to report what he had learned.

On the evening of December 19, 1995, Charles McDonald, another roofer, visited Castillo's apartment. Castillo offered to sell a set of silverware to McDonald for $500. McDonald testified that the silverware was in a wooden box. When McDonald later viewed Berndt's silverware, he noted that it appeared to be the same silverware that Castillo tried to sell to him.

Based upon the information provided by Rasmussen, police obtained and executed a search warrant on the apartment shared by Castillo, Bryant, and Platou at 10:00 p.m. on December 19, 1995. Castillo and Bryant were present when the police arrived and permitted them to enter; both Castillo and Bryant gave their consent to a search of their apartment. Police recovered the silverware, the VCR, the booties, and a bottle of lighter fluid from the apartment. The officers also located a notebook with the notation "$50, VCR, $75, camera, silverware."

After execution of the search warrant, the officers arrested Castillo. At the detective bureau, Castillo waived his *Miranda* rights and made statements during two separate, consecutive interviews. During the first interview, Castillo indicated that he had received the VCR and other property from a friend. Shortly after the first interview ended, the detectives returned and informed Castillo of the evidence that had been obtained against him from Bryant and Rasmussen. Castillo then confessed to the killing, robbery, and arson.

Subsequently, Castillo pleaded not guilty on all counts, and a jury trial commenced August 26 and concluded on September 4, 1996. The prosecution presented all the evidence cited above in its case in chief. The defense did not put on a case in chief. The jury returned guilty verdicts on all counts: conspiracy to commit burglary, burglary, robbery of a victim sixty-five years or older, first degree murder with use of a deadly weapon, conspiracy to commit burglary and arson, and first-degree arson.

Castillo's penalty hearing took place from September 19 to September 24, 1996. Bruce Kennedy of the Nevada Youth Parole Board

3

testified about Castillo's extensive juvenile history and record. Kennedy became acquainted with Castillo in 1984 while Kennedy was a parole counselor at the Nevada Youth Training Center in Elko. Kennedy's testimony revealed: (1) Castillo began running away from home regularly when he was nine years old, (2) by 1984, Castillo had already been charged with attempted murder, petty larceny, and six counts of arson (including an incident in which he tried to burn down the Circus Circus Hotel in Las Vegas), and (3) much of Castillo's criminal misbehavior remained uncharged. Kennedy also testified that, by the age of fifteen, Castillo had already used marijuana, speed, cocaine, and alcohol.

Due to his extensive misbehavior, Castillo participated in numerous Nevada state juvenile programs, lived with family members in different areas of the country for short periods of time and ultimately returned to Nevada. During his adolescence, doctors determined that Castillo understood the difference between right and wrong, did not suffer from a neurological disorder, but suffered from a personality disorder.

Other State witnesses testified that in 1990, at age seventeen, Castillo escaped from a Nevada youth training facility; Castillo was arrested for attempted burglary and later certified to adult status on charges arising from this incident. Castillo served fourteen months in prison, expiring his term. In April 1993, Castillo was convicted of robbery arising from an incident which occurred in December 1992. Castillo had a gun during that robbery. Castillo was sentenced to three years, served just under two years, committed multiple disciplinary infractions while in prison, and was released in May 1995.

In June 1995, Castillo participated in the armed robbery of a cashier, but was not formally charged. In December 1995, Castillo was charged with battery upon one of his neighbors. These charges were pending at the time of the instant trial.

After this extensive testimony about Castillo's prior criminal behavior, the State introduced victim impact evidence through testimony by Berndt's granddaughters and Berndt's daughter, Hosking. These individuals testified about their personal interaction with Berndt, the quality of Berndt's life, and the effect of Berndt's death on their lives.

The first defense witness, a neuropsychologist, testified that Castillo: had been emotionally, mentally, physically and behaviorally abused; suffered from "reactive attachment disorder" and "attention deficit hyperactivity disorder;" and came from a dysfunctional family. One correctional officer and one juvenile facility counselor testified as to several positive episodes regarding Castillo.

Thereafter, Castillo's girlfriend, Bryant, testified that Castillo had few social skills, acted like a "big kid," but was trying to improve. Castillo's mother testified that Castillo had a difficult upbringing due to the physical and emotional abuse he received from his biological father, her own lack of affection for Castillo, and the family's instability. At the hearing's conclusion, Castillo read an unsworn statement to the jury expressing his feelings including regret and remorse concerning his conduct.

4

The jury returned a verdict of death, finding four aggravating circumstances and three mitigating circumstances. The jury found that the aggravating circumstances were that the murder was committed: (1) by a person previously convicted of a felony involving the use or threat of violence, specifically, a robbery committed on December 14, 1992; (2) while Castillo was committing burglary; (3) while Castillo was committing robbery; and (4) to avoid or prevent a lawful arrest. The jury found the following mitigating circumstances: (1) the youth of the defendant at the time of the crime; (2) the murder was committed while the defendant was under the influence of extreme emotional distress or disturbance; and (3) any other mitigating circumstances.

Opinion, Respondents' Exh. 112, pp. 1-7 (ECF No. 91-14, pp. 2-8)) (published as *Castillo v. State*, 114 Nev. 271, 956 P.2d 103 (1998)).

Castillo was sentenced in Nevada's Eighth Judicial District Court (Clark County) on November 4, 1996, as follows: to 28 to 72 months in prison on Count I, conspiracy to commit burglary and/or robbery; to 48 to 120 months in prison on Count II, burglary; to 72 to 180 months in prison, plus a consecutive term of 72 to 180 months, for the elderly victim enhancement, on Count III, robbery, victim sixty-five years, or older; to death by lethal injection on Count IV, murder with use of a deadly weapon; to 28 to 72 months in prison on Count V, conspiracy to commit burglary and arson; to 48 to 120 months in prison on Count VI, burglary; and to 72 to 180 months in prison on Count VII, first-degree arson. *See* Judgment of Conviction, Respondents' Exh. 97 (ECF No. 90-31). All the sentences run consecutively. *See id*.

The Nevada Supreme Court affirmed the judgment of conviction on April 2, 1998. *See* Opinion, Respondents' Exh. 112 (ECF No. 91-14). The Nevada Supreme Court denied Castillo's petition for rehearing on November 25, 1998. *See* Order Denying Rehearing, Respondents' Exh. 122 (ECF No. 91-24). The United States Supreme Court denied Castillo's petition for writ of certiorari on March 22, 1999. *See Castillo v. Nevada*, 526 U.S. 1031 (1999); Letter Regarding Denial of Petition for Writ of Certiorari, Respondents' Exh. 129 (ECF No. 91-31). The Nevada Supreme Court's remittitur issued on April 28, 1999. *See* Remittitur, Respondents' Exh. 134 (ECF No. 92-5).

On April 2, 1999, Castillo filed a petition for writ of habeas corpus in the state district court. *See* Petition for Writ of Habeas Corpus (Post-Conviction), Respondents'

Exh. 130 (ECF No. 92). The court appointed counsel to represent Castillo, and, with counsel, Castillo filed a supplemental brief in support of his petition. *See* Supplemental Brief in Support of Defendant's Petition for Writ of Habeas Corpus (Post-Conviction), Respondents' Exh. 155 (ECF Nos. 92-26, 92-27, 92-28). The court held an evidentiary hearing on August 2, 2002. *See* Recorder's Transcript, Respondents' Exh. 166 (ECF No. 93-7). Castillo then filed a second supplemental brief in support of his petition. *See* Second Supplemental Brief in Support of Defendant's Post Conviction Petition for Writ of Habeas Corpus, Respondents' Exh. 168 (ECF No. 93-9). On January 22, 2003, the court heard oral argument, and then denied Castillo's petition. *See* Recorder's Transcript, Respondents' Exh. 171 (ECF No. 93-12). The court filed its written order, denying Castillo's petition, on June 11, 2003. *See* Findings of Fact, Conclusions of Law and Order, Respondents' Exh. 183 (ECF No. 93-24). Castillo appealed. *See* Notice of Appeal, Respondents' Exh. 172 (ECF No. 93-13). The Nevada Supreme Court affirmed the denial of Castillo's petition on February 5, 2004. *See* Order of Affirmance, Respondents' Exh. 198 (ECF No. 94-15). The United States Supreme Court denied Castillo's petition for a writ of certiorari on October 4, 2004. *See* Letter Regarding Denial of Petition for Writ of Certiorari, Respondents' Exh. 208 (ECF No. 94-25); Order of the Supreme Court, Respondents' Exh. 209 (ECF No. 94-26).

This Court received Castillo's original *pro se* federal petition for writ of habeas corpus, initiating this case, on June 22, 2004. *See* Petition for Writ of Habeas Corpus (ECF No. 1).

The Court appointed counsel to represent Castillo. *See* Order entered July 7, 2004 (ECF No. 4); *see also* Notice of Acceptance of Appointment (ECF No. 7).

On November 15, 2005, Castillo filed a motion for leave to conduct discovery (ECF Nos. 22, 35). The Court granted that motion in part and denied in part. *See* Order entered June 15, 2006 (ECF No. 38). In particular, the Court denied Castillo leave to conduct discovery regarding claims not exhausted in state court. *See id.* Castillo moved for reconsideration, and the Court denied the motion for reconsideration (ECF No. 48).

The discovery was concluded by March 2, 2007. *See* Order entered January 3, 2007 (ECF No. 48).

On July 30, 2007, Castillo filed, *pro se*, a notice (ECF No. 51) requesting that this action be dismissed and his death sentence carried out. The Court held a hearing regarding Castillo's request on August 13, 2007. *See* Minutes of Proceedings (ECF No. 55). The Court treated Castillo's notice as a request for voluntary dismissal, and granted that request, dismissing the case, without prejudice, on September 6, 2007. *See* Order entered September 4, 2007 (ECF Nos. 57, 58). After an apparent change of heart, Castillo moved to reinstate his federal habeas petition (ECF No. 59). The Court granted Castillo's motion, and vacated the judgment (ECF No. 62).

On December 15, 2008, Castillo filed a first amended petition for writ of habeas corpus (ECF No. 70). Respondents filed a motion to dismiss Castillo's first amended habeas petition (ECF No. 85). In response, Castillo moved for a stay of this action (ECF No. 98). On January 21, 2010, the Court granted Castillo's motion for stay, and stayed this action pending Castillo's further exhaustion of claims in state court (ECF No. 106).

On September 18, 2009, Castillo initiated his second state habeas action. *See* Petition for Writ of Habeas Corpus (Post-Conviction), Respondents' Exh. 222 (ECF Nos. 141-5, 141-6). On April 9, 2010, the state district court heard oral arguments, and denied Castillo's petition. *See* Recorder's Transcript, Respondents' Exh. 245 (ECF No. 143-6). The court filed its written ruling, denying Castillo's petition, on May 12, 2010. *See* Findings of Fact, Conclusions of Law and Order, Respondents' Exh. 247 (ECF No. 143-8). Castillo appealed. *See* Notice of Appeal, Respondents' Exh. 249 (ECF No. 143-10). On July 18, 2013, the Nevada Supreme Court affirmed the denial of Castillo's second state habeas petition. *See* Order of Affirmance, Respondents' Exh. 268 (ECF No. 144-12). The Nevada Supreme Court denied Castillo's petition for rehearing on November 22, 2013. *See* Order Denying Rehearing, Respondents' Exh. 270 (ECF No. 144-14).

Castillo then moved to lift the stay of this case, reporting that the state court proceedings had been completed (ECF No. 118). The Court granted that motion and lifted the stay on January 10, 2014 (ECF No. 120).

On May 19, 2014, Castillo filed a second amended petition for writ of habeas corpus (ECF No. 126), which is the operative petition in this case. Castillo's second amended petition sets forth the following claims:

1. Castillo's federal constitutional rights were violated because of ineffective assistance of counsel.

    I. Guilt Phase of Trial

        A. Castillo's trial counsel was ineffective with respect to handling of the jury selection process, and appellate counsel was ineffective for not raising this issue.

        B. Castillo's trial counsel was ineffective for failure to present a psychological defense.

    II. Penalty Phase of Trial

        A. Castillo's trial counsel was ineffective for failure to investigate, identify, and present mitigating evidence.

        B. Castillo's trial counsel was ineffective for failure to object to improper vouching of third-party witnesses.

        C. Castillo's trial counsel was ineffective for failure to adequately prepare witnesses for cross-examination.

2. Castillo's federal constitutional rights were violated because the prosecutors used the same acts to support a conviction for first-degree murder and to support one or more aggravating factors, and trial and appellate counsel were ineffective for failing to raise this issue.

3. Castillo's federal constitutional rights were violated because the trial judge failed to properly instruct the jury.

    I. Guilt Phase of Trial

        A. The trial court failed to properly instruct the jury regarding the elements of first-degree murder.

        B. The trial court failed to properly instruct the jury regarding reasonable doubt.

C. The trial court failed to properly instruct the jury regarding malice aforethought, and appellate counsel was ineffective for failing to raise this issue.

II. Penalty Phase of Trial

A. The trial court failed to give a presumption of life instruction.

B. The trial court failed to properly instruct the jury regarding reasonable doubt, and trial counsel was ineffective for failing to raise this issue.

C. The trial court failed to instruct the jury that it could consider other bad act evidence only after it found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, and appellate counsel was ineffective for failing to raise this issue.

4. Castillo's federal constitutional rights were violated because the prosecutor's non-statutory aggravating evidence included juvenile offenses and juvenile misconduct, and trial and appellate counsel were ineffective for failing to raise this issue.

5. Castillo's federal constitutional rights were violated, in the penalty phase of his trial, as a result of presentation of criminal juvenile records, and trial counsel was ineffective for failing to raise this issue.

6. Castillo's federal constitutional rights were violated because prosecutors introduced evidence in the penalty phase of trial that Castillo held racist "white supremacist" beliefs, and trial and appellate counsel were ineffective for failing to raise this issue.

7. Castillo's federal constitutional rights were violated because of prosecutorial misconduct in the penalty phase of the trial.

II. A. The prosecutor identified mitigating factors that Castillo did not raise or introduce evidence to support, and trial and appellate counsel were ineffective for failing to raise this claim.

II. B. The prosecutor argued that Castillo was an improbable candidate for rehabilitation, and trial and appellate counsel were ineffective for failing to raise this claim.

II. C. The prosecutor forced jurors to choose between executing Castillo or an innocent future victim, and trial and appellate counsel were ineffective for failing to raise this claim.

9

8.     Castillo's federal constitutional rights were violated because the prosecutors introduced unduly prejudicial victim impact testimony.

II. A.     The prosecutors introduced irrelevant and prejudicial victim impact evidence during the guilt phase of the trial.

IV.     The prosecutors introduced unduly prejudicial victim impact testimony during the penalty phase of the trial.

9.     Castillo's federal constitutional rights were violated because the trial judge allowed the prosecutor to elicit testimony regarding Castillo's other criminal acts.

10.     Castillo's federal constitutional rights were violated because of the trial court's failure to record critical proceedings, and trial counsel was ineffective for failing to raise this issue.

11.     Castillo's federal constitutional rights were violated because Nevada's deadly weapon enhancement statute was vague and over-broad, and trial and appellate counsel were ineffective for failing to raise this issue.

12.     Castillo's federal constitutional rights were violated because his sentence was enhanced based on Nevada's deadly weapon enhancement statute when neither the jury verdict nor the indictment supported such enhancement, and trial and appellate counsel were ineffective for failing to raise this issue.

13.     Castillo's federal constitutional rights were violated because Nevada's lethal injection scheme constitutes cruel and unusual punishment.

14.     Castillo's death sentence is in violation of his federal constitutional rights due to the restrictive conditions on Nevada's death row and delay caused by ineffective assistance of his trial and appellate counsel, and appellate counsel was ineffective for failing to raise this issue.

15.     Castillo's federal constitutional rights were violated because his trial, sentencing, and review on direct appeal were conducted before state judicial officers whose tenure in office was not dependent on good behavior but was rather dependent on popular election, and who failed to conduct fair and adequate appellate review.

16.     Castillo's federal constitutional rights were violated because of the arbitrariness of Nevada's capital sentencing scheme.

17.     Castillo's death sentence is in violation of his federal constitutional rights because executing a mental ill, cognitively distressed individual constitutes cruel and unusual punishment.

18.     Castillo's federal constitutional rights were violated because the trial judge, in his instructions to the jury, and the prosecutor, during arguments, limited the jury's consideration of Castillo's theory of mitigating factors.

> 19.    Castillo's federal constitutional rights were violated because of the cumulative errors in his trial, appeal and state post-conviction proceedings.

Second Amended Petition (ECF No. 126), pp. 29-228.

The respondents filed a motion to dismiss Castillo's second amended petition (ECF No. 140), arguing that various claims in the second amended petition are barred by the statute of limitations, unexhausted, barred by the procedural default doctrine, and not cognizable in this federal habeas corpus action. The Court ruled on that motion, granting it in part and denying it in part, on March 2, 2016 (ECF No. 184). The following claims in Castillo's second amended petition were dismissed: Claims 1(I)(A), 1(II)(A), 1(II)(B), 1(II)(C), 3(I)(B), 3(I)(C), 3(II)(A), 3(II)(B), 4, 5, 6, 7(II)(A), 7(II)(B), 8(II)(A) (to the extent based on Hosking's testimony about the health and state of mind of the victim), 10, 11 (to the extent based on alleged ineffective assistance of counsel), 12, 14, 15, 17 and 18 (to the extent based on the prosecution's closing arguments). The Court also dismissed all petitioner's claims to the extent they are based on alleged ineffective assistance of counsel in his state habeas proceedings, and all petitioner's claims to the extent that they are based on alleged violation of the International Covenant on Civil and Political Rights. In all other respects, the motion to dismiss was denied.

Respondents then filed their answer (ECF No. 189), responding to the claims remaining in Castillo's second amended petition. Castillo filed a reply (ECF No. 195), and Respondents filed a response to the reply (ECF No. 215).

On December 23, 2016, Castillo filed a motion for reconsideration of certain aspects of the March 2, 2016, order (ECF No. 196), a motion for a stay (ECF No. 198), a motion for leave to supplement his second amended petition (ECF No. 199), and a motion for an evidentiary hearing (ECF No. 201). The Court denied those motions on September 18, 2017 (ECF No. 222).

On September 28, 2017, Castillo filed a motion for reconsideration of the Court's denial – in the order of September 18, 2017 – of his motion for a stay and his motion for

leave to supplement his second amended petition (ECF No. 223). The Court denied that

motion on January 29, 2018 (ECF No. 230).

The case is now before the Court for adjudication of the merits of the claims

remaining in Castillo's second amended petition for writ of habeas corpus.

Discussion

Standard of Review

Because this action was initiated after April 24, 1996, the amendments to

28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act

(AEDPA) apply. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Van Tran v. Lindsey*,

212 F.3d 1143, 1148 (9th Cir. 2000), overruled on other grounds by *Lockyer v. Andrade*,

538 U.S. 63 (2003). 28 U.S.C. § 2254(d) sets forth the primary standard of review under

the AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established Supreme Court

precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a

rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the

state court confronts a set of facts that are materially indistinguishable from a decision

of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme

Court's] precedent." *Lockyer*, 538 U.S. at 73 (*quoting Williams v. Taylor*, 529 U.S. 362,

405-06 (2000)).

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (*quoting Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (*quoting Williams*, 529 U.S. at 409).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (*citing Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has also instructed that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (*citing Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (AEDPA standard is "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

The state courts' "last reasoned decision" is the ruling subject to section 2254(d) review. *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010). If the last reasoned state-court decision adopts or substantially incorporates the reasoning from a previous state-court decision, a federal habeas court may consider both decisions to ascertain the state courts' reasoning. *See Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).

If the state supreme court denies a claim but provides no explanation for its ruling, the federal court still affords the ruling the deference mandated by section 2254(d); in such a case, the petitioner is entitled to habeas relief only if "there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98.

The analysis under section 2254(d) looks to the law that was clearly established by United States Supreme Court precedent at the time of the state court's decision. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

In considering the petitioner's claims under section 2254(d), the federal court generally takes into account only the evidence presented in state court. *Pinholster*, 563 U.S. at 185-87.

If the petitioner meets the standard imposed by section 2254(d), the federal court may then allow factual development, possibly including an evidentiary hearing, and the federal court's review is then *de novo. See Panetti v. Quarterman*, 551 U.S. 930, 948 (2007); *Wiggins*, 539 U.S. at 528-29; *Runningeagle v. Ryan*, 686 F.3d 758, 786-88 (9th Cir. 2012).

Also, the federal court's review is *de novo* for claims not adjudicated on their merits by the state courts. *See Cone v. Bell*, 556 U.S. 449, 472 (2009); *Porter v. McCollum*, 558 U.S. 30, 39 (2009).

Claim 1(I)(B)

In Claim 1(I)(B), Castillo claims that his federal constitutional rights were violated because of ineffective assistance of counsel, as a result of his trial counsel's failure to present a psychological defense in the guilt phase of his trial. *See* Second Amended Petition (ECF No. 126), pp. 31-35.

Castillo asserted this claim in his first state habeas action. *See* Supplemental Brief in Support of Defendant's Petition for Writ of Habeas Corpus (Post-Conviction), Respondents' Exh. 155, pp. 40-43 (ECF Nos. 92-26, p. 42 - ECF No. 92-27, p. 4); Second Supplemental Brief in Support of Defendant's Post Conviction Petition for Writ of Habeas Corpus, Respondents' Exh. 168, pp. 9-10 (ECF No. 93-9, pp. 10-11). The state district court held an evidentiary hearing. *See* Recorder's Transcript, Respondents' Exh. 166 (ECF No. 93-7). That court then denied relief on the claim, ruling as follows:

> Defendant's specific claim that counsel was ineffective in not investigating and presenting a psychological defense must fail.

First, the trial record itself does not support such a defense. Defense counsel did investigate the Defendant's psychological history and had a psychological evaluation performed by Dr. Lewis Etcoff. In past psychological evaluations, the Defendant was characterized as extremely intelligent and manipulative. The record shows that Defendant was not under any type of mental incapacity when he committed the crimes for which he was charged. Several psychological evaluations of the Defendant had been conducted over the years to determine the cause of his behavior. Defendant was never found to have any mental illness. The Defendant has never been treat[ed] for any mental disorder except for a two-year period when he was a youth in which he was experimentally given Ritalin to see if it would be of any benefit. The results of that experimental period were inconclusive. In all of Defendant's psychological evaluations, the Defendant was determined to be of above average intelligence with no mental deficiencies. Defendant's problems were determined to be a result of immaturity and poor judgment. Dr. Lewis Etcoff testified for the defense at the penalty hearing. During his testimony, Dr. Etcoff concluded that the Defendant did not suffer from any mental illness. In fact, Dr. Etcoff's psychological evaluation of the Defendant would have been harmful to any kind of defense counsel may have proffered. Dr. Etcoff concluded that the Defendant is intelligent, rebellious and hostile. There is nothing in the record to indicate that a psychological defense would have been successful, and Defendant has failed to proffer any evidence outside the record to support his claim.

Second, the testimony at the evidentiary hearing demonstrates that a psychological defense would not have succeeded. At the evidentiary [hearing], Defendant's counsel referenced the Zolie Dumas case, *Dumas v. State*, 111 Nev. 1270, 903 P.2d 816 (1995), and specifically questioned Mr. Schieck [Castillo's trial counsel] as to why he did not pursue a diminished capacity defense in attempt to get a conviction of second degree murder and not first degree murder. Mr. Schieck testified that he did not see any diminished capacity defense that the jury would accept because Defendant's intelligence was not similar to Mr. Dumas' and also that there were a number of factual distinctions between the two cases. For example, Dumas was found to be in the second percentile of intelligence and functioned at about third-grade level, *Dumas* at 1270, whereas Defendant in the instant case was determined to be of above average intelligence. "[S]trategic choices made by counsel after thoroughly investigating the plausible options are almost unchallengeable." *Dawson v. State*, 108 Nev. 112, 117, 825 P.2d 593, 596 (1992). The Nevada Supreme Court has held that it is presumed counsel fully discharged his duties, and said presumption can only be overcome by strong and convincing proof to the contrary. *Donovan v. State*, 94 Nev. 671, 675, 584 P.2d 708, 711 (1978).

Thus, it cannot be said that either trial or appellate counsel fell below an objective standard of reasonableness or that their conduct caused Defendant any prejudice.

Findings of Fact, Conclusions of Law and Order, Respondents' Exh. 183, pp. 5-6 (ECF

No. 93-24, pp. 6-7) (paragraph numbering omitted).

Castillo then asserted the claim on the appeal in his first state habeas action, and the Nevada Supreme Court affirmed the denial of relief on the claim, ruling as follows:

Castillo claims that his trial counsel was ineffective in failing to properly investigate the case and failing to present a psychological defense in the guilt phase. This claim has no merit. Castillo identifies no evidence which his counsel failed to uncover. He argues that psychological evidence presented by the defense in the penalty phase should have been presented in the guilt phase, making it possible for the jury to find second-degree murder. He cites this court's opinion in *Dumas v. State*, where we concluded that defense counsel was ineffective for failing to investigate and present a defense of mental incapacity or, at least, of a mental state inconsistent with deliberate, premeditated murder. [Footnote: 111 Nev. 1270, 903 P.2d 816 (1995).] Again, Castillo's authority is not apposite.

Dumas stabbed to death his fiancée; he was mentally deficient and illiterate, had an IQ of 69, and functioned at about a third-grade level. [Footnote: *Id.* at 1271, 903 P.2d at 816-17.] A psychiatrist employed by the State "reported that Dumas probably suffered 'organic damage to [his] intellectual capabilities and was incapable of premeditating'" the killing. [Footnote: *Id.*] The psychiatrist believed rather that "Dumas was acting on impulse and out of emotional desperation." [Footnote: *Id.*] Dumas's counsel failed to investigate or present this evidence. The facts in this case are not comparable. Castillo's counsel did employ a psychologist to investigate Castillo's mental condition. And the record shows that Castillo was average or even above average in intelligence and highly capable of calculation and manipulation; he was delinquent and exhibited a personality disorder but had no neurological damage, mental illness, or learning disability. At the evidentiary hearing, Castillo's trial and appellate counsel, David Schieck, testified that he "didn't see any diminished capacity defense that the jury would accept." He considered the *Dumas* case different in that Dumas was mentally retarded and committed a crime of passion. Schieck believed that the psychological evidence gathered by his expert was germane only to the penalty phase, and "in fact, a lot of what he would have had to have told the jury about [Castillo's] background probably would have been damaging at the guilt phase of the trial." We conclude that the record shows that defense counsel acted reasonably in investigating Castillo's mental condition and deciding not to offer psychological evidence in the guilt phase.

Order of Affirmance, Respondents' Exh. 198, pp. 7-9 (ECF No. 94-15, pp. 8-10).

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two prong test for analysis of claims of ineffective assistance of counsel: the petitioner must demonstrate (1) that the attorney's representation "fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

16

*Strickland*, 466 U.S. at 688, 694. A court considering a claim of ineffective assistance of counsel must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. And, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104-05. In *Harrington*, the Supreme Court instructed:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, [*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 994-95 (2010) (acknowledging double deference required with respect to state court adjudications of *Strickland* claims).

In analyzing a claim of ineffective assistance of counsel under *Strickland*, a court may first consider either the question of deficient performance or the question of prejudice; if the petitioner fails to satisfy one element of the claim, the court need not consider the other. *See Strickland*, 466 U.S. at 697.

In light of the evidence relied upon by Castillo in his first state habeas action (*see Pinholster*, 563 U.S. at 181 ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.")), the Nevada Supreme Court's ruling, denying relief on this claim, was not unreasonable. In state court, Castillo focused his argument on the report and penalty-phase testimony of Dr. Lewis Etcoff, the psychologist retained by Castillo's trial counsel, and asserted that his trial counsel was ineffective for not presenting Dr. Etcoff as a witness in the guilt phase of the trial to attempt to show that Castillo could not have formed the intent required for first-degree murder. However, neither Dr. Etcoff's report (Petitioner's Exh. 26 (ECF No. 128-6, pp. 1-18)), nor Dr. Etcoff's testimony in the penalty phase of the trial (Respondents' Exh. 81, pp. 53-107 (ECF No. 90-12, p. 11 - ECF No. 90-13, p. 20), provides any significant basis for argument that Castillo did not kill willfully, deliberately, and with premeditation. Dr. Etcoff determined that, as a child, at least in part as a result of neglect and abuse, Castillo suffered from Reactive Attachment Disorder, Attention Deficit Hyperactivity Disorder (ADHD), Conduct Disorder, and Personality Disorder; Dr. Etcoff opined that, as a child, Castillo had difficulty controlling his impulses. However, Dr. Etcoff's report and penalty phase testimony said little or nothing about Castillo's ability as an adult, when burglarizing Ms. Berndt's home, to form the intent necessary for first-degree murder.

At the evidentiary hearing in Castillo's first state habeas action, Castillo's trial counsel testified as follows:

> Q.      I also want to ask you about the psychological part of this case. You produced a Dr. Etcoff at the penalty phase of Mr. Castillo to attempt to save his life, is that fair to say?
>
> A.      That's correct.
>
> Q.      And, Dr. Etcoff, as I have written in my briefs, told us that Mr. Castillo had lived a[n] extremely difficult life, would that be fair?
>
> A.      I don't recall whether Dr. Etcoff got into his background or whether we presented that through other witnesses. I believe it probably was Dr. Etcoff that went into his history, but we did present his mother that also presented testimony that verified the things Dr. Etcoff told the jury.

Q.      You did not present any psychological evidence in the trial –
or in the guilt portion of the case, did you?

        A.      That's correct.

        Q.      It would be fair to say that the Supreme Court stated that
really no defense had been placed on at the time of the guilt phase?

        A.      They indicated that we presented no case in chief, which
was correct.

        Q.      Opening argument was waived?

        A.      To my recollection, it was waived.

                                *    *    *

        Q.      Mr. Schieck, would it be fair to say that there was no real
defense put on for the guilt phase because of the difficulty with the
evidence?

        A.      That's fair to say.

        Q.      Did you know that a first degree murder conviction was
probably going to be returned?

        A.      Yes.

        Q.      You've read the *Zollie Dumas* case?

        A.      Yes.

        Q.      Okay why was Dr. Etcoff not put on in the guilt phase to try
to argue to the jury that there was a diminished capacity and therefore
there was perhaps a right to convict of second degree murder but not
first?

        A.      I didn't see any diminished capacity defense that the jury
would accept. Mr. Castillo was – his intelligence was not similar to
Mr. Dumas'. I mean, there's a number of distinctions between factually
Zollie Dumas' situation, the defense that could have been put on in that
case and Mr. Castillo's., the facts of his case and his own character.

        Q.      So, your testimony is that you did not see it as necessary to
put on a psychological defense because you didn't have one?

        A.      I did not believe we had one.

Recorder's Transcript, Respondents' Exh. 166, pp. 9-11 (ECF No. 93-7, pp. 10-12). On

cross-examination, Castillo's trial counsel testified further:

        Q.      Now, as far as investigation, you had Dr. Etcoff evaluate the
Defendant?

                                    19

A.    Yes.

Q.    Now you and I are both familiar with the *Zollie Dumas* case, being as how we both argued it at the Supreme Court, what are the differences in your opinion between *Zollie Dumas* and *Castillo*? Why were they different?

A.    Mr. Dumas' IQ was – was below the level for mental retardation as I recall. The crime of Mr. Dumas was clearly a crime of passion in that he was stabbing the – a lady that he had a relationship with, and the multiple stab wounds, the frenzy of the apparent attack on her, the psychological evidence in that case probably could have affected the jury in deciding whether or not there was premeditation and deliberation in the acts or whether it was just a rash impulse. Now, back when Dumas went to trial and got reversed, we didn't have the instruction we now have on premeditation and deliberation. But, with that instruction and with psychological test and the way it could have been presented about Zollie, the jury probably wouldn't have convicted him of first degree murder.

Q.    So, would it be fair to say that Zollie Dumas had a diagnosis of mental illness?

A.    Mental retardation, I'm not sure illness or retardation.

Q.    So, did you have any information about Castillo's mental capacity?

A.    I don't have a specific recollection of what his IQ was, but certainly it was not that he was mentally retarded in any way, shape or form.

Q.    And, did Dr. Etcoff, didn't he testify that the Defendant didn't suffer from any – from mental illness?

A.    I don't recall what his diagnosis exactly was.

Q.    And, so was it your strategic decision – or was it your legal opinion that that psychological evidence that Dr. Etcoff could give was only germane to the penalty phase?

A.    Yes.

Q.    Okay.

A.    And, in fact, a lot of what he would have had to have told the jury about Billy's background probably would have been damaging at the guilt phase of the trial.

*Id.* at 16-17 (ECF No. 93-7, pp. 17-18).

Applying a "strong presumption" that counsel's representation was within the

"wide range" of reasonable professional assistance, it was reasonable for Castillo's trial

20

counsel to determine that Dr. Etcoff's testimony would not support a psychological defense, and that, on the contrary, it could well have undermined any defense Castillo might have pursued. Dr. Etcoff's testimony in the penalty phase of the trial included the following:

> Q.   Mr. Castillo also developed another disorder, childhood onset conduct disorder?
>
> A.   Yes.
>
> A conduct disorder is simply real bad behavior gone too far, including – now you're actually doing physically aggressive things, such as lighting fires, which everybody, I imagine, already knows that he lit terrible fires, hurting animals. He killed birds. He killed his grandmother's dog.
>
> It's oppositional behavior that goes well beyond having a chip on your shoulder and being defiant and a snooty kid to very serious pre-sociopathic behavior that has to be dealt with at that point or else it only worsens.
>
> Q.   With the disorders you've talked about for William, any indication that he knew what he was doing was wrong?
>
> A.   He's bright enough I.Q.-wise that he probably did know after he did something that it was wrong. We can start at least at eight or nine when children begin to think somewhat abstractly. Prior to that time, he just probably reacted impulsively and set fires and killed animals, which is typical of children who have had this type of early experience.
>
> But after awhile, he certainly knew right from wrong but had a hard time doing right. And that has, of course, lasted throughout his life.
>
> Q.   Is that having to do with the lack of impulse control?
>
> A.   Partly to do with a lack of impulse control, partly to do with a no real conscience, as a result of his early childhood and the amount of enormous anger he must have felt for having been reportedly abused by his stepfather, by his uncle, and for just moving around so often that he had a very abnormal and terrible childhood. So he must have been angry for all of those reasons.
>
> *   *   *
>
> Q.   Some of the reports describe William as a seriously-disturbed child who is beyond the scope of the services, and this is from Missouri Department of Social Services.
>
> Is that an accurate description for William and the juvenile system?
>
> A.   Yes.

Q.    If an individual has the background, or even if we take William, that individual decides that he really wants to function in society and is going to give it his best effort, given the problems that you've seen in his history, would he be able to do that?

A.    At this point?

Q.    Yes, not having received treatment, just being released to the street, as he was before his latest incarceration.

A.    Mr. Castillo released to the streets? I wouldn't do that.

Q.    Even despite any wishes he may have to live a proper life, you're saying that he would not be able to do so because of his background?

A.    He is too dangerous.

Q.    It's your recommendation, from what you know of Mr. Castillo, that he be incarcerated?

A.    Oh, yes.

Q.    And not released?

A.    Absolutely.

                    *    *    *

Q.    Okay. You did some tests on William?

A.    Yes, I did.

Q.    And at page 13 you said, "Mr. Castillo had very high and significant elevations on," and there is a whole litany?

Anti-social?

A.    Yes.

Q.    What's that? Just common sense words to the ladies and gentlemen of the jury. He is very anti-social. What does that mean?

A.    He doesn't have a conscience. He will act out against the norms of society.

Q.    He can hurt people, other people, and he doesn't feel bad about it, does he?

A.    That's correct.

Q.    He is aggressive/sadistic. What does that mean?

A.    That scale measures on the personality test a propensity to want retribution, to enjoy hurting other people.

Q.      So not only is he willing to hurt other people and not feel bad about it, he enjoys it?

A.      That's very possible.

Reporter's Transcript, September 20, 1996, Respondents' Exh. 81, pp. 73-74, 79-80, 94-95 (ECF No. 90-12, pp. 31-32, 37-38; ECF No. 90-13, pp. 7-8) (last-quoted portion from cross-examination). Given Dr. Etcoff's opinions, it was reasonable for Castillo's counsel to decide not to call Dr. Etcoff as a witness in the guilt phase of the trial, and it was reasonable to not pursue a diminished capacity defense.

Even if the Court takes into consideration the new evidence proffered by Castillo in this action, but not before the state courts in his first state habeas action, the Court's conclusion in this regard is not changed. In this action, Castillo points to the reports of Rebekah G. Bradley, Ph.D. (Petitioner's Exh. 36 (ECF No. 128-7)) and Jonathan H. Mack, Psy.D. (Petitioner's Exh. 38 (ECF No. 128-9)), both of whom evaluated Castillo. Those reports were both produced in 2008, four years after Castillo's first state habeas action was completed. They were not before the state courts in Castillo's first state habeas case.

In her report, Dr. Bradley, a psychologist, reviews the abuse and violence to which Castillo was exposed as a child, and opines that, as a child, he suffered from Posttraumatic Stress Disorder (PTSD). *See* Report of Rebekah G. Bradley, Ph.D., Petitioner's Exh. 36 (ECF No. 128-7). Dr. Bradley explicitly states that she did not determine whether Castillo suffered from PTSD as an adult. *See id.* at 7, ¶30 (ECF No. 128-7, p. 8). Regarding the crimes underlying this case, Dr. Bradley states in her report:

> Mr. Castillo reports that he experienced one of these dissociative episodes on the night at the time of the criminal events in question. He reports that when the robbery was not proceeding according to his plan and he thought that the person in the house was not a woman as he had believed but a man who was about to wake up, he entered this type of dissociative state. "I made my aggressive move; I went into penitentiary battle mode. Michelle's screams brought me back to reality."

23

*Id.* at 8 (ECF No. 128-7, p. 9). However, there, Dr. Bradley does nothing more than relate what Castillo told her; she does not state her own opinion regarding Castillo's mental state at the time of the killing. Furthermore, nowhere in her report does Dr. Bradley relate any of her findings regarding Castillo to the elements of first-degree murder. Dr. Bradley's report provides little support for Castillo's claim that his trial counsel was ineffective for not presenting a diminished capacity defense at trial.

Dr. Mack is also a psychologist. His report, as well, reviews Castillo's personal history, as revealed by documents that he examined and an interview of Castillo. *See* Report of Jonathan H. Mack, Psy.D., Petitioner's Exh. 38 (ECF No. 128-9). Dr. Mack also reports the results of tests he administered to Castillo. *See id.* Dr. Mack's diagnosis includes: "Cognitive Disorder NOS," "Reactive Attachment Disorder of Early Childhood," "Posttraumatic Stress Disorder, Chronic," "Conduct Disorder, Childhood-Onset Type," "Antisocial Personality Features," "History of serial concussions," "Problems with primary support group," "Problems related to the social environment," and "Problems related to interactions with the legal system." *See id.* at 17/18 (ECF No. 128-9, p. 66). Dr. Mack concludes:

> The history and test findings suggest, as stated within a reasonable degree of neuropsychological and psychological certainty, that at the time of the criminal events in question, Mr. Castillo was under extreme emotional duress due to activation of his Posttraumatic Stress Disorder by the specific circumstances of the criminal incident as they unfolded. It is my further opinion, as stated within a reasonable degree of psychological and neuropsychological certainty, that Mr. Castillo's Posttraumatic Stress Disorder combined … with his organic tendency to be overreactive to environmental inputs as a direct consequence of his Cognitive Disorder NOS and underlying difficulties with sensory integration and sensory modulation to render him incapable of conforming his behavior to the requirements of law.

*Id.* As with Dr. Bradley, Dr. Mack does not relate his findings to the elements of first-degree murder – that is, he does not render any opinion as to whether Castillo was or was not able to form the intent necessary for first-degree murder.

The jury was presented overwhelming evidence in the guilt phase of the trial showing that Castillo planned and executed the burglary of Ms. Berndt's home using a

key that he had found while working there; carried a tire iron into her home during the burglary, despite using the key to get in; savagely beat Ms. Berndt with the tire iron when she stirred from her sleep, and then smothered her with a pillow to kill her; stole several items from her home; and later returned to set her home on fire to destroy evidence. The evidence that Castillo's crimes were carried out in such a calculated manner far eclipses anything in the reports of Dr. Bradley and Dr. Mack that arguably supports the proposition that Castillo was incapable of forming the intent necessary for first-degree murder.

Moreover, the reports of Dr. Bradley and Dr. Mack would have presented trial counsel with the same dilemma that Dr. Etcoff's report did: any support that such expert opinions would have provided for a diminished capacity defense would have been outweighed by damage done to Castillo's defense.

Therefore, even taking into account the reports of Dr. Bradley and Dr. Mack, Castillo does not show that his trial counsel was ineffective for not pursuing a diminished capacity defense in the guilt phase of his trial.

Castillo argues that his reliance on the reports of Dr. Bradley and Dr. Mack fundamentally alter this claim, placing it in a "significantly different and stronger evidentiary posture than it was when the state courts considered it," such that it should be considered procedurally defaulted, and therefore subject to *de novo* review if he can show that his state post-conviction counsel was ineffective for not presenting such evidence in support of the claim in his first state habeas action. *See* Reply (ECF No. 195), pp. 22-27, citing *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014). That analytical approach does not alter the Court's conclusion that relief must be denied on this claim. As there is no showing that there was a viable diminished capacity defense available to Castillo's trial counsel, and because any attempt by trial counsel to substantiate such a defense would have exposed the jury to damaging information about Castillo, Castillo's state post-conviction counsel was not ineffective for not developing and producing evidence such as the

25

reports of Dr. Bradley and Dr. Mack in support of this claim, and Castillo was not prejudiced by the decision not to do so. *See Martinez*, *supra*. Therefore, even accepting Castillo's contention, and treating this claim, as supported with the reports of Drs. Bradley and Mack, as procedurally defaulted, the Court would find this claim barred by the procedural default doctrine, and subject to denial on that ground.

The Court will deny habeas corpus relief with respect to Ground 1(I)(B).

Claim 2

In Claim 2, Castillo claims that his federal constitutional rights were violated because the prosecutors used the same acts to support a conviction for first-degree murder and to support one or more aggravating factors, and trial and appellate counsel were ineffective for failing to raise this issue. *See* Second Amended Petition (ECF No. 126), pp. 107-12. In this claim, Castillo points out that he was prosecuted for first-degree murder on theories of both premeditated murder and felony murder, with the felony murder theory based on allegations that Castillo killed Ms. Berndt in the course of a burglary and in the course of a robbery. Castillo also points out that the jury found him guilty of first-degree murder in a general verdict, without specifying which theory – premeditated murder or felony murder – the jury relied upon. Castillo goes on to point out that, in the penalty phase of his trial, the prosecution asserted as aggravating factors, making him eligible for the death penalty, that the murder was committed in the course of a burglary and in the course of a robbery, and those were two of the four aggravating factors found by the jury. Castillo goes on:

> Because the jury relied on the acts of robbery and burglary to convict Mr. Castillo of murder, and thereafter to render him death eligible, Mr. Castillo's federal constitutional rights were violated. The Eighth Amendment requires that a death penalty statute rationally narrow the class of persons eligible for the death penalty, from all persons who commit murder to those persons whose extreme culpability makes them the most deserving of execution. Whenever a jury relied on the same factual allegations to convict a defendant of murder, and thereafter to impose a death sentence, the narrowing function of the Eighth Amendment was not served.

*Id.* at 110-11. Castillo's claim is grounded in part on *McConnell v. State*, 102 P.3d 606 (Nev. 2004), in which the Nevada Supreme Court held that it is "impermissible under the United States and Nevada Constitutions to base an aggravating circumstance in a capital prosecution on the felony upon which a felony murder is predicated." *McConnell*, 102 P.3d at 624.

In this case, in the order entered March 2, 2016, the Court ruled that this claim was untimely filed and procedurally defaulted, but that Castillo may be able to overcome those bars by showing that he is actually innocent of the death penalty. *See* Order entered March 2, 2016 (ECF No. 184), pp. 16, 26-27, 33, 44-47, 59. The Court declined to rule on those issues in that order, however, reserving its ruling until after Respondents filed an answer, and Castillo a reply. *See id.*

Castillo asserted this claim in his second state habeas action. The state district court ruled, as follows, that the claim was procedurally barred, and that Castillo did not show a fundamental miscarriage of justice – innocence of the death penalty – to overcome the procedural bar:

> Review of the *McConnell* claim is not warranted even under the fundamental miscarriage of justice doctrine. *McConnell*-type error is an instructional error and concerns only alleged legal innocence, not factual innocence. Furthermore, in a *McConnell* claim there is no allegation of new evidence which is necessary to support a genuine claim of actual innocence or fundamental miscarriage of justice.
>
> Even applying *McConnell*, this Court finds that only the felony-burglary and felony-robbery aggravators would be stricken and that two valid aggravators would remain, namely being convicted of a prior crime of violence, and murder committed to avoid or prevent a lawful arrest. This Court finds the evidence in aggravation to be compelling but the evidence in mitigation to be relatively weak. After reweighing the remaining aggravating and mitigating evidence, this Court concludes beyond a reasonable doubt that the jury still would have imposed death absent the erroneous aggravating circumstances. Accordingly, Castillo has failed to show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under the applicable statute, and he is not actually innocent of the death penalty.

Findings of Fact, Conclusions of Law and Order, Respondents' Exh. 247, p. 3 (ECF No. 143-8, p. 4). The Nevada Supreme Court affirmed that ruling, holding that Castillo's

claims, in his second state habeas action, were procedurally barred, and that he did not make a showing to overcome the procedural bars; however, the court did not, in that order, specifically discuss Castillo's argument that he was actually innocent of the death penalty and could therefore overcome the procedural default. *See* Order of Affirmance, Respondents' Exh. 268 (ECF No. 144-12). Castillo petitioned for rehearing, and, in its order denying rehearing, the Nevada Supreme Court ruled as follows:

> Castillo argues that two of the four aggravating circumstances found in the penalty phase were invalid based on *McConnell v. State*, 120 Nev. 1043, 102 P.3d 606 (2004), and that if this court reweighed and considered all of the mitigation evidence that should have been presented to the jury, he would be actually innocent of the death penalty and his death sentence would be reversed. Castillo fails to demonstrate that he would be entitled to relief.

> After striking the invalid aggravating circumstances, two remain – Castillo was previously convicted of a felony involving the use or threat of use of violence and he committed the murder to avoid lawful arrest. This court may uphold a death sentence based in part on an invalid aggravating circumstance by reweighing the aggravating and mitigating evidence or conducting a harmless-error review. *Clemons v. Mississippi*, 494 U.S. 738, 741 (1990); [*State v. Haberstroh*, 119 Nev. 173, 183, 69 P.3d 676, 682 (2003)]. Although Castillo argues that in reweighing or conducting a harmless-error review we must consider new mitigating evidence that was not presented to the trial jury, this court has reiterated time and again that reweighing is based on the trial record. *See Bejarano v. State*, 122 Nev. 1066, 1081, 146 P.3d 265, 276 (2006) ("Reweighing requires us to answer the following question: Is it clear beyond a reasonable doubt that absent the invalid aggravators the jury still would have imposed a sentence of death?"); *Rippo v. State*, 122 Nev. 1086, 1093-94, 146 P.3d 279, 284 (2006) (striking three *McConnell* aggravators and reweighing, looking only to the record for mitigating evidence); *Archanian v. State*, 122 Nev. 1019, 1040-41, 145 P.3d 1008, 1023 (same); *State v. Haberstroh*, 119 Nev. 173, 184 n.23, 69 P.3d 676, 683 n.23 (2003) (reweighing does not involve factual findings other than those of the jury at the original penalty hearing"); *Bridges v. State*, 116 Nev. 752, 766, 6 P.3d 1000, 1010 (2000) (this court reweighed based on a "review of the trial record"). The special verdict indicates that one or more jurors found the following mitigating circumstances: (1) Castillo's youth at the time of the crime, (2) he committed the murder under the influence of extreme emotional distress or disturbance, and (3) "[a]ny other mitigating circumstances." Based on the record, the "other mitigating circumstances" found by the trial jurors may have included that Castillo admitted guilt, demonstrated remorse, cooperated with police, did not plan the murder, and had a difficult childhood. Considering these mitigating circumstances and the remaining valid aggravating circumstances, we are confident that the jury would have concluded that that mitigating circumstances did not outweigh the valid aggravating circumstances. We further conclude beyond a reasonable doubt that the jury would have returned a death sentence after considering the evidence as a whole, which reflects a

particularly brutal murder: Castillo hit the sleeping elderly victim several times in the head with a tire iron, smothered her face with a pillow, and later returned to burn the house down. Accordingly, we deny the rehearing petition.

Order Denying Rehearing, Respondents' Exh. 270, pp. 1-3 (ECF No. 144-14, pp. 2-4).

The Nevada Supreme Court's consideration of this issue was in the context of the question whether Castillo could overcome the procedural bar of the claim by showing that he was innocent of the death penalty, and that there would be a fundamental miscarriage of justice if the claim were not considered on its merits. Castillo's argument that the Nevada Supreme Court adjudicated this claim on its merits (*see*, *e.g.*, Reply (ECF No. 195), pp. 29, 42-47) is without merit.

Similarly, in this order, this Court considers this claim purely within the context of Castillo's argument that he can overcome the procedural default and statute of limitations bars of the claim by showing his actual innocence of the death penalty. Therefore, the deference to the state-court ruling prescribed by 28 U.S.C. § 2254(d) does not apply. The Court considers these issues *de novo*.

To demonstrate actual innocence to overcome a procedural default or statute of limitations bar, the general rule is that the petitioner "must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *McQuiggin v. Perkins*, 569 U.S. 383, 399 (2013); *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *see also Schlup*, 513 U.S. at 329 ("a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt"). "Based on this total record, the court must make a 'probabilistic determination about what reasonable, properly instructed jurors would do.'" *House v. Bell*, 547 U.S. 518, 538 (2016), quoting *Schlup*, 513 U.S. at 329. "The Court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538. Meeting this standard "raise[s] sufficient doubt about [the petitioner's] guilt to

undermine confidence in the result of the trial without the assurance that the trial was untainted by constitutional error," warranting "a review of the merits of the constitutional claims[.]" *Schlup*, 513 U.S. at 317.

Respondents point out that Castillo does not cite any United States Supreme Court precedent, or other federal court precedent for that matter, directly supporting the proposition that the burglary and robbery aggravating factors are invalid. In other words, Respondents contend – accurately it appears – that there is no federal analog to the Nevada Supreme Court's *McConnell* decision. This, though, is not controlling. The question before the Court is "actual innocence," within the meaning of *Schlup* and *McQuiggin*. As Castillo is under sentence of death on a state-court conviction, the matter of his guilt or innocence with respect to the application of the death penalty is a matter of state law. As the Nevada courts have invalidated two aggravating factors, the question becomes whether that has rendered Castillo "innocent" of the death penalty – whether it is more likely than not that no reasonable juror would have sentenced him to death in light of the invalidation of the two aggravating factors. *See McQuiggin*, 569 U.S. at 399; *Schlup*, 513 U.S. at 327-29.

The jury found there to be two other aggravating factors, which were not in violation of *McConnell*, and which are, for purposes of this analysis, valid: the murder was committed by a person previously convicted of a prior violent felony, and the murder was committed to avoid or prevent a lawful arrest. The Nevada Supreme Court ruled that, with the two invalid aggravators taken out of the equation, the mitigating circumstances did not outweigh the two valid aggravators, Castillo remained eligible for the death penalty, and the jury would still have sentenced Castillo to death.

The Nevada Supreme Court, then, has ruled on the question that is now before this Court. A majority of that court determined that, without the invalid aggravators, Castillo was not innocent of the death penalty. As the standard to be applied under *McQuiggin* and *Schlup* is a matter of what reasonable jurors would find, the Nevada Supreme Court's ruling, which this Court finds to be reasonable, is a strong indicator

that a reasonable juror could have sentenced Castillo to death absent the invalid

aggravators.

Castillo does not show that the reweighing conducted by the Nevada Supreme

Court was unreasonable. In its order denying Castillo rehearing, the Nevada Supreme

Court explicitly weighed the two remaining valid aggravators – "Castillo was previously

convicted of a felony involving the use or threat of use of violence and he committed the

murder to avoid lawful arrest" – against the mitigating circumstances identified by the

jury – "(1) Castillo's youth at the time of the crime, (2) he committed the murder under

the influence of extreme emotion al distress or disturbance, and (3) '[a]ny other

mitigating circumstances.'" Order Denying Rehearing, Respondents' Exh. 270, pp. 1-3

(ECF No. 144-14, pp. 2-4). The Nevada Supreme Court stated that "[b]ased on the

record, the 'other mitigating circumstances' found by the trial jurors may have included

that Castillo admitted guilt, demonstrated remorse, cooperated with police, did not plan

the murder, and had a difficult childhood." *Id.* at 2 (ECF No. 144-14, p. 3). That court,

with one justice dissenting, ruled:

> Considering these mitigating circumstances and the remaining valid
> aggravating circumstances, we are confident that the jury would have
> concluded that the mitigating circumstances did not outweigh the valid
> aggravating circumstances. We further conclude beyond a reasonable
> doubt that the jury would have returned a death sentence after considering
> the evidence as a whole, which reflects a particularly brutal murder.
> Castillo hit the sleeping elderly victim several times in the head with a tire
> iron, smothered her face with a pillow, and later returned to burn the
> house down.

*Id.* at 2-3 (ECF No. 144-14, pp. 3-4).

Castillo does not identify any federal constitutional infirmity in the Nevada

Supreme Court's analysis. As a general rule, when an aggravating factor is invalidated,

a reviewing court may, short of remanding for re-sentencing, either reweigh the

mitigating evidence against the remaining aggravating factors or determine whether the

consideration of the invalid aggravating factor was harmless error. *See Clemons v.*

*Mississippi*, 494 U.S. 738, 741 (1990). The reviewing court must closely scrutinize "the

import and effect of invalid aggravating factors," by "determin[ing] what the sentencer

would have done absent the factor[s]." *Stringer v. Black*, 503 U.S. 222, 230 (1992). Despite Castillo's extensive arguments to the contrary, the Nevada Supreme Court did not violate these constitutional directives in re-weighing the aggravating factors against the mitigating circumstances in this case. The Nevada Supreme Court conducted the "close appellate scrutiny" contemplated by *Stringer*.

This Court, then, finds that the Nevada Supreme Court's ruling, reweighing the mitigating circumstances against the aggravators in Castillo's case, was reasonable and not in violation of Castillo's federal constitutional rights. And, this Court agrees with the conclusion reached by the Nevada Supreme Court.

Castillo argues that the Nevada Supreme Court's analysis was flawed because that court did not, in its reweighing of aggravating and mitigating factors, consider mitigation evidence produced in his second state habeas action but not in the penalty phase of his trial. *See* Reply (ECF No. 195), pp. 31-32, 41. Castillo argues that federal law required the state supreme court to consider the mitigation evidence developed later, in his second state habeas action; for that proposition, he cites *Williams v. Taylor*, 529 U.S. 362, 397 (2000). In *Williams*, a capital habeas case, the petitioner's trial counsel was ruled ineffective for not sufficiently investigating and presenting mitigating evidence at trial; the part of *Williams* cited by Castillo stands for the unsurprising proposition that, in such a case, in considering the prejudice caused by the attorney's ineffectiveness, the reviewing court must take into consideration the mitigation evidence developed in the habeas action, *i.e.*, the mitigation evidence that the trial attorney should have discovered and offered at trial. *See Williams*, 529 U.S. at 396-99. The issue here is not a claim of ineffective assistance of counsel; it is a reweighing of aggravating and mitigating factors after certain aggravating factors are invalidated. *Williams* does not support Castillo's contention that federal law required the Nevada courts to take into consideration mitigation evidence not presented at trial. Castillo also cites *Parker v. Dugger*, 498 U.S. 308, 313, 322 (1990), *Richmond v. Lewis*, 506 U.S. 40, 42-43, 48-49, 52 (1992), and *Valerio v. Crawford*, 306 F.3d 742, 759 (9th Cir. 2002)

32

(*see* Reply (ECF No. 195), pp. 31-32), but none of those cases have any bearing on the question under consideration here. There was no issue in *Parker, Richmond*, or *Valerio* with respect to whether a reviewing court, in reweighing aggravating and mitigating circumstances, must take into consideration mitigation evidence not produced in the trial court's sentencing, but developed in a subsequent post-judgment proceeding. In fact, Castillo cites no precedent in which a reviewing court, conducting a reweighing, took such later-developed mitigating evidence into consideration, much less any federal precedent requiring that a reviewing court do so.

Moreover, even if this Court were to accept Castillo's position, that later-developed mitigation evidence must be taken into consideration in the reweighing, the Court's conclusion regarding this claim would not change. This Court, independently viewing the remaining aggravators and all the mitigating circumstances – taking into consideration all the mitigating circumstances asserted by Castillo in this case, including the reports of Dr. Bradley and Dr. Mack – would conclude that a reasonable juror could still have found that the mitigating circumstances did not outweigh the valid aggravators. The evidence at trial showed that Castillo, who was previously convicted of a violent crime, snuck into an elderly lady's house at night to steal possessions from her, and when she stirred in her sleep, he became concerned that he would be caught, beat her with a tire iron, and smothered her to death; then, later, he returned and set her house on fire in a further attempt to conceal his crimes. The valid aggravating factors, that Castillo was previously convicted of a felony involving the use or threat of use of violence and that he committed the murder to avoid lawful arrest, are weighty. The Court is cognizant of the evidence that Castillo's childhood was nightmarish, and does not consider his mitigation evidence to be insubstantial by any means, but still concludes that a reasonable juror could have found that the mitigating circumstances did not outweigh the valid aggravators.

Castillo does not make the sort of showing of actual innocence required under *McQuiggen* and *Schlup* to overcome the procedural default and statute of limitations

33

bars of this claim. The Court, therefore, denies relief on Claim 2 on the ground that the claim is barred by the procedural default doctrine and the statute of limitations.

Claim 3(I)(A)

In Claim 3(I)(A), Castillo claims that his federal constitutional rights were violated because the trial court failed to properly instruct the jury regarding the elements of first-degree murder. *See* Second Amended Petition (ECF No. 126), pp. 113-18.

In this claim, Castillo places at issue the so-called "*Kazalyn* instruction," a jury instruction approved in *Powell v. State*, 108 Nev. 700, 838 P.2d 921 (1992), and disapproved by the same court eight years later in *Byford v. State*, 116 Nev. 215, 994 P.2d 700 (2000). The *Kazalyn* instruction (so-called because it was discussed by the Nevada Supreme Court in *Kazalyn v. State*, 108 Nev. 67, 825 P.2d 578 (1992)), as given in the guilt phase of Castillo's trial, was as follows:

> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
>
> Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.

Instructions to the Jury, Respondents' Exh. 67, Instruction No. 17 (ECF No. 89-24, p. 21). Castillo argues that this instruction was unconstitutional because it collapsed three elements of first-degree murder – "willful, deliberate and premeditated" – into one element: "premeditation." *See* Second Amended Petition (ECF No. 126), pp. 113-18.

Castillo asserted this claim in his second state habeas action. The state district court ruled that the claim was procedurally barred, and that Castillo did not show good cause, such as to overcome the procedural bar. *See* Findings of Fact, Conclusions of Law and Order, Respondents' Exh. 247, pp. 3-4 (ECF No. 143-8, pp. 4-5). The Nevada Supreme Court affirmed that ruling as follows, holding that the claim was procedurally barred, and that Castillo did not make a showing that failure to consider the claim on the merits would result in a fundamental miscarriage of justice because he is actually

34

1  innocent of first degree murder under the holding of *Byford v. State*, 116 Nev. 215, 994

2  P.2d 700 (2000):

3      In *Byford*, this court disapproved of the commonly-known *Kazalyn*
       instruction and provided the district courts with instructions to use in the

4      future. [Footnote: *Kazalyn v. State*, 108 Nev. 67, 75, 825 P.2d 578, 583
       (1992).] [*Byford*, 116 Nev.] at 233-37, 994 P.2d at 712-15. However, we

5      concluded in *Nika v. State*, that *Byford* does not apply to cases that were
       final when it was decided. 124 Nev. 1272, 1276, 198 P.3d 839, 842

6      (2008). Castillo's conviction was final before *Byford* was decided and
       therefore *Byford* does not apply.

7
       Castillo acknowledges *Nika* but argues that the decision ignores the

8      constitutional vagueness arguments attendant to the *Kazalyn* instruction
       and failed to determine whether *Byford* should apply retroactively as a

9      substantive rule of criminal law. We disagree. Until *Byford*, this court
       consistently upheld the *Kazalyn* instruction and rejected constitutional

10     challenges similar to Castillo's. *Byford* did not alter the law in effect when
       Castillo's conviction became final; rather, it changed the law prospectively.

11     And because that change concerned a matter of state law, the *Byford*
       decision did not implicate federal constitutional concerns.

12
       Further, Castillo's claim that the use of the *Kazalyn* instruction in

13     this case resulted in a fundamental miscarriage of justice because the jury
       would have found him guilty of second-degree murder rather than first-

14     degree murder lacks merit. In order to demonstrate a fundamental
       miscarriage of justice, a petitioner must make a colorable showing of

15     actual innocence – factual innocence, not legal innocence. [*Pellegrini v.
       State*, 117 Nev. 860, 887, 34 P.3d 519, 537 (2001).]; *Calderon v.*

16     *Thompson*, 523 U.S. 538, 559 (1998). Castillo's claim relating to the jury
       instructions is not a claim regarding factual innocence and he fails to

17     demonstrate that, had the jury not received the *Kazalyn* instruction, "'it is
       more likely than not that no reasonable juror would have convicted him in

18     light of … new evidence.'" *Calderon*, 523 U.S. at 559 (quoting *Schlup v.
       Delo*, 513 U.S. 298, 327 (1995)); *accord Mazzan v. Warden*, 112 Nev.

19     838, 842, 921 P.2d 920, 922 (1996). Beyond those hurdles to his actual-
       innocence claim, the underlying idea that Castillo would not have been

20     convicted of first-degree murder but for the *Kazalyn* instruction is
       fundamentally flawed. Castillo was charged with first-degree murder

21     based on two theories: that the murder was committed in the perpetration
       or attempted perpetration of two felonies (burglary and robbery) and that

22     the murder was willful, deliberate, and premeditated. The evidence
       supported a conclusion that Castillo murdered Berendt during the

23     perpetration of a burglary and robbery, and he was convicted of burglary
       and robbery. The evidence also supported a finding that the murder was

24     premeditated and deliberate – Castillo entered Berendt's home with a tire
       iron, hit the sleeping 86-year-old woman with the tire iron, and then

25     smothered her with a pillow. Because there was substantial evidence that
       Castillo was guilty of first-degree murder under both the felony-murder

26     theory and premeditation theory, he could not demonstrate even legal
       innocence based on the *Kazalyn* instruction. Therefore, the district court

27     did not err in denying this claim without an evidentiary hearing.

28

Order of Affirmance, Respondents' Exh. 268, pp. 6-8 (ECF No. 144-12, pp. 7-9). Castillo petitioned for rehearing, and, in its order denying rehearing, the Nevada Supreme Court did not further discuss this issue. Order Denying Rehearing, Respondents' Exh. 270 (ECF No. 144-14).

In the order entered March 2, 2016, this Court ruled that this claim was untimely filed, and procedurally defaulted, but that Castillo may be able to overcome those bars by showing that he is actually innocent. *See* Order entered March 2, 2016 (ECF No. 184), pp. 16-17, 26-27, 33, 47-48, 59. The Court declined to rule on those issues in that order, however, reserving its ruling until after Respondents filed an answer, and Castillo a reply. *See id.*

In *Polk v. Sandoval*, 503 F. 3d 903 (9th Cir. 2007), the court of appeals held that the *Kazalyn* instruction is unconstitutional because it relieves the State "of its burden of proving every element of first-degree murder beyond a reasonable doubt." *Polk*, 503 F.3d at 909. Subsequently, however, in *Babb v. Lozowsky*, 719 F.3d 1019 (9th Cir. 2013), the court determined that its holding in *Polk* was no longer good law in light of the intervening Nevada Supreme Court decision in *Nika v. State*, 198 P.3d 839 (Nev. 2008), in which the Nevada Supreme Court explained that "*Byford* represented a change in, rather than a clarification of, [Nevada] law." *Babb*, 719 F.3d at 1029. Thus, in cases in which the conviction was final after the *Powell* decision but prior to the *Byford* decision – like this case – the *Kazalyn* instruction did not violate the federal constitution. After *Powell* and prior to *Byford*, willfulness, deliberation, and premeditation were not separate elements of the *mens rea* necessary for first-degree murder, and the *Kazalyn* instruction accurately set forth Nevada law. *See id.*

Castillo's conviction became final on April 28, 1999, when the Nevada Supreme Court issued its remittitur after affirming his conviction on direct appeal. *See* Remittitur, Respondents' Exh. 134 (ECF No. 92-5). That was after *Powell* and before *Byford*. Castillo's claim is, therefore, foreclosed by the holding in *Babb*. The instruction he challenges was not unconstitutional.

Turning to the question whether Castillo has made a sufficient showing of actual innocence to overcome the procedural bars of this claim, the Court determines that there is no "new evidence," or more accurately, given the nature of Castillo's argument, no different jury instructions that should have been given, the effect of which on reasonable jurors must be considered. *See McQuiggin*, 569 U.S. at 399; *Schlup*, 513 U.S. at 327.

As the Court understands Castillo's argument, he claims that, even if the *Kazalyn* instruction properly stated the elements of first-degree murder under state law at the time of his conviction, the instruction violated his federal constitutional rights because it rendered ambiguous the Nevada statutes defining the degrees of murder, and blurred the distinction between first-degree and second-degree murder. This legal argument, however, does not suggest the sort of factual innocence required to overcome the procedural bars of this claim, under *McQuiggin* and *Schlup*. Castillo presents no new evidence, in the light of which it is more likely than not that no reasonable juror would have convicted him of first-degree murder, found him eligible for the death penalty or sentenced him to death.

Castillo's argument that he can overcome the statute of limitations and procedural default bars of this claim by a showing of actual innocence fails. The Court, therefore, denies relief on Claim 3(I)(A), on the ground that the claim is barred by the procedural default doctrine and the statute of limitations.

Claim 3(II)(C)

In Claim 3(II)(C), Castillo claims that his federal constitutional rights were violated, in the penalty phase of his trial, because the trial court failed to instruct the jury that it could consider other bad act evidence only after it found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, and appellate counsel was ineffective for failing to raise this issue. *See* Second Amended Petition (ECF No. 126), pp. 123-24.

37

Castillo asserted such a claim on the appeal in his first state habeas action, and the Nevada Supreme Court affirmed the denial of the claim, briefly discussing only the ineffective assistance of counsel part of the claim, as follows:

> Castillo also contends that his trial and appellate counsel were ineffective in failing to challenge the jury instructions in regard to the use of character or "other matter" evidence in the penalty hearing. He cites [*Evans v. State*, 117 Nev. 609, 28 P.3d 498 (2001)] again but fails to show that it is apposite. Castillo does not provide this court with the instructions given in his case; he simply asserts that they did not properly inform the jury on how to consider the penalty evidence. [Footnote: *See Greene v. State*, 96 Nev. 555, 558, 612 P.2d 686, 688 (1980) ("The burden to make a proper appellate record rests on the appellant."); *see also Jacobs v. State*, 91 Nev. 155, 158, 532 P.2d 1034, 1036 (1975); NRAP 30(b)(3).] However, the error in *Evans* was not incorrect jury instructions but improper argument by the prosecutor, who wrongly directed jurors to employ "other matter" evidence in determining the existence and weight of aggravating circumstances. [Footnote: *See* 117 Nev. at 634-37, 28 P.3d at 515-17.] This court stated that the jury instructions in that case, though accurate, "did not cure the error introduced by the incorrect argument." [Footnote: *Id.* at 635, 28 P.3d at 516.] *Evans* set forth for future use jury instructions describing the restricted use of "other matter" evidence, but it did not imply, let alone hold, that lack of such instructions in prior cases constituted error. [Footnote: *Id.* at 634-37, 28 P.3d at 515-17.] Castillo has shown neither that his attorneys acted deficiently nor that he was prejudiced.

Order of Affirmance, Respondents' Exh. 198, pp. 6-7 (ECF No. 94-15, pp. 7-8).

This claim is without merit. Castillo cites no federal authority, much less United States Supreme Court precedent, remotely supporting the proposition that the suggested jury instruction is constitutionally mandated.

Castillo cites *Arave v. Creech*, 507 U.S. 463 (1993), and *Lowenfeld v. Phelps*, 484 U.S. 231 (1988), for the general proposition that a State's capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty; however, Castillo points to no authority supporting his contention that the suggested jury instruction is necessary in that regard. Castillo also cites *Godfrey v. Georgia*, 446 U.S. 420 (1980), but that case is wholly inapposite; *Godfrey* does not involve any issue regarding a jury instruction like the one Castillo contends should have been given.

Castillo makes no showing that the Nevada Supreme Court's denial of his claim – that his federal constitutional rights were violated, in the penalty phase of his trial,

because the trial court failed to instruct the jury that it could consider other bad act evidence only after it found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt – was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

Furthermore, the part of the claim asserting that Castillo's federal constitutional rights were violated on account of ineffective assistance of his appellate counsel is also without merit. To the extent that Castillo argues that his appellate counsel was ineffective for not asserting on appeal that state law required the trial court to give the suggested jury instruction, that argument is foreclosed by the Nevada Supreme Court's ruling on this issue. The Nevada Supreme Court held that the lack of the suggested instruction was not error as a matter of state law. That ruling, based on the Nevada Supreme Court's construction of Nevada law, is authoritative, and is not subject to review in this federal habeas corpus action. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Bonin v. Calderon*, 59 F.3d 815, 841 (9th Cir. 1995). And, again, Castillo cites no federal precedent holding that the suggested jury instruction is constitutionally required. Castillo's appellate counsel was not ineffective, in violation of his constitutional rights, for not arguing on his direct appeal that the trial court erred in failing to instruct the jury that it could consider other bad act evidence only after it found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

The Nevada Supreme Court's denial of relief on this claim was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

The Court will deny Castillo relief on Claim 3(II)(C).

1    Claim 7(II)(C)

2        In Claim 7(II)(C), Castillo claims that his federal constitutional rights were violated

3    as a result of prosecutorial misconduct in the penalty phase of his trial because the

4    prosecutor forced jurors to choose between executing Castillo or an innocent future

5    victim, and trial and appellate counsel were ineffective for failing to raise this claim. *See*

6    Second Amended Petition (ECF No. 126), pp. 164-65.

7        This claim concerns the following exchange, which occurred during the

8    prosecutor's closing argument in the penalty phase of Castillo's trial:

9           [MR. HARMON (prosecutor)]:  The issue is do you, as the trial jury,
        this afternoon have the resolve and the courage, the determination, the
10      intestinal fortitude, the sense of commitment to do your legal and [moral]
        duty, for whatever your decision is today, and I say this based upon the
11      violent propensities that Mr. Castillo has demonstrated on the streets, I
        say it based on upon the testimony of Dr. Etcoff and Corrections Officer
12      Berg about the threat he is to other inmates, and I say it based upon the
        analysis of his inherent future dangerousness, whatever your decision is
13      today and it's sobering, whatever the decision is, you will be imposing a
        judgment of death and it's just a question of whether it will be an execution
14      sentence for the killer of Mrs. Berndt or for a future victim of this
        defendant.
15
            MR. SCHIECK [defense counsel]:  I'm going to object, your Honor,
16      to the argument of future victims.

17          THE COURT:  Sustained.

18          Jury is admonished to disregard that argument.

19          MR. HARMON:  Your Honor, I am simply making the argument
        [approved] in *Redmon v. State*, future dangerousness. Future
20      dangerousness to whom? It has to be not to dogs, cats, it has to be to
        individuals. The cases say that we may argue theories of penology and
21      deterrence, reasons for punishment. The [*Pellegrini* case], the *Jimenez*
        case, the *Snow* case –
22
            THE COURT:  Yes, I understand that, Mr. Harmon. I'll reverse the
23      ruling. You are correct.

24    Trial Transcript, September 24, 1996, Afternoon Session, Respondents' Exh. 83,

25    pp. 65-66 (ECF No. 90-17, pp. 32-33).

26        On his direct appeal, Castillo raised this issue, and the Nevada Supreme Court

27    ruled as follows:

28

Castillo contends that the prosecutor's improper argument concerning future victims mandates a new penalty hearing pursuant to *Howard v. State*, 106 Nev. 713, 800 P.2d 175 (1990) ("*Howard II*"). Castillo further contends that the prosecutor's argument "went far beyond that Castillo might be a future danger."

This improper prosecutorial argument to which Castillo objected at trial, was as follows:

> The issue is do you, as the trial jury, this afternoon have the resolve and the intestinal fortitude, the sense of commitment to do your legal and moral duty, for whatever your decision is today, and I say this based upon the violent propensities that Mr. Castillo has demonstrated on the streets, I say it based upon the testimony of Dr. Etcoff and Corrections Officer Berg about the threat he is to other inmates, and I say it based upon the analysis of his inherent future dangerousness, whatever your decision is today, and it's sobering, whatever the decision is, you will be imposing a judgment of death and it's just a question of whether it will be an execution sentence for the killer of Mrs. Berndt or for a future victim of this defendant.

This court has held that a prosecutor may argue the future dangerousness of a defendant during a penalty hearing even "where there is no evidence of violence independent of the murder in question." *Jones v. State*, 113 Nev. 454, 469, 937 P.2d 55, 64 (1997) (citing *Redman v. State*, 108 Nev. 227, 235, 828 P.2d 395, 400 (1992)). Here, the prosecutor presented to the jury copious evidence of Castillo's dangerous propensities. Specifically, Dr. Etcoff, a psychologist for the defense, testified on cross-examination that Castillo told him: (1) he had a "God-like" complex when he had a gun, (2) he had committed many crimes, and (3) he was not afraid of punishment. Dr. Etcoff also testified that due to Castillo's attitude, Castillo was likely to be more rebellious in prison, act aggressively and anti-socially, and injure people without remorse. Dr. Etcoff further testified that in the past, Castillo had been violent in prison, even in the high security wing, and that Castillo would continue to pose a security threat.

Corrections Officer Mark Berg testified that while serving a sentence in the Northern Nevada Corrections Center in 1992 and 1993, Castillo assaulted other inmates on at least two separate occasions, and breached other prison security regulations. We conclude that in addition to the violent nature of the crime in this case, we conclude that there exists copious evidence to support the future dangerousness theory presented by the prosecution.

We also conclude, however, that portions of the prosecutor's future dangerousness argument were improper. We take this opportunity to sharpen the line that separates proper from improper future dangerousness argument.

In *Jones v. State*, this court admonished the prosecutor for suggesting that the defendant, Jones, might have intended to use weapons, found in his cell before trial, to inflict bodily harm upon members

41

of the jury. 113 Nev. 454, 469, 937 P.2d 55, 64-65 (1997). Our admonition in the *Jones* case clarified our position that personalizing the identity of a defendant's potential future victim is improper. Absent abundant evidence of guilt, such conduct might merit a new penalty hearing. We affirmed this position in *McGuire v. State*, 100 Nev. 153, 158, 677 P.2d 1060, 1064 (1984) where we declared improper a prosecutor's attempt to personalize the identity of a future victim, by suggesting that individual jurors place themselves in the position of the victim or a member of the victim's family.

In *Howard v. State* we held that it is also "improper to ask the jury to vote in favor of future victims and against the defendant." 106 Nev. 713, 719, 800 P.2d 175, 178 (1990). In the instant case, the prosecutor presented to the jurors just such a choice when he said, "you will be imposing a judgment of death and it's just a question of whether it will be an execution sentence for the killer of Mrs. Berndt or for a future victim of this defendant." This language improperly suggests that the jury must decide whether to execute the defendant or bear responsibility for the death of an innocent future victim. Presenting the jury's decision as a choice between killing a guilty person or an innocent person will likely result in a juror's decision to impose the death penalty more often than if the jury's decision had been portrayed in its proper light.

The test for evaluating whether an inappropriate comment by the prosecutor merits reversal of the defendant's conviction is whether the inappropriate comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Bennett v. State*, 111 Nev. 1099, 1105, 901 P.2d 676, 680 (1995). We conclude that although a portion of the prosecutor's argument was improper, the improper portion did not unfairly prejudice Castillo in light of the overwhelming evidence of his guilt.

Opinion, Respondents' Exh. 112, pp. 10-13 (ECF No. 91-14, pp. 11-14). Castillo

petitioned the Nevada Supreme Court for rehearing, and in the order denying rehearing,

the court ruled, further, as follows:

This court affirmed appellant William Patrick Castillo's conviction and sentence in an opinion filed April 2, 1998. *Castillo v. State*, 114 Nev. 271, 956 P.2d 103 (1998). We concluded that an improper remark by the prosecutor during the penalty phase did not warrant reversal.

The test for evaluating whether an inappropriate comment by the prosecutor merits reversal of the defendant's conviction is whether the inappropriate comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Bennett v. State*, 111 Nev. 1099, 1105, 901 P.2d 676, 680 (1995). We conclude that although a portion of the prosecutor's argument was improper, the improper portion did not unfairly prejudice Castillo in light of the overwhelming evidence of his guilt.

*Id.* at [281], 956 P.2d at 109-10.

42

Castillo points out that this court misstated the proper standard of review when we stated that we relied on the evidence supporting Castillo's conviction to evaluate the fairness of the penalty proceedings and affirm Castillo's sentence. This court was required to determine whether the prosecutor's improper remarks were unfairly prejudicial and violated due process in light of the strength of the evidence which supported imposing the death penalty on Castillo. *See Guy v. State*, 108 Nev. 770, 786, 839 P.2d 578, 588 (1992).

This court may grant rehearing if "it appears that the court has overlooked or misapprehended a material matter in the record or otherwise" or in such other circumstances as will promote substantial injustice." NRAP 40(c)(2).

We conclude that our misstatement was not material and does not warrant rehearing. Given the strong evidence of the aggravated nature of the murder in this case, evidence which we considered in rendering our original decision, the prosecutor's improper remarks did not unfairly prejudice Castillo. The jurors validly found four aggravating circumstances. They found that the mitigating evidence did not outweigh the aggravating. They were familiar with the circumstances of the murder, which was callous, brutal, and completely unprovoked. They were also familiar with the victim, who was an elderly woman living alone. Given these facts which strongly support the jurors' verdict, we conclude beyond a reasonable doubt that the prosecutor's remarks did not unfairly prejudice Castillo.

This court did not misapprehend a material matter requiring rehearing, and rehearing would not promote substantial justice. We therefore deny the petition.

Order Denying Rehearing, Respondents' Exh. 122, pp. 1-2 (ECF No. 91-24, pp. 2-3).

Then, in his first state habeas action, Castillo raised his related ineffective assistance of counsel claims, and the state district court denied those claims, ruling as follows:

3. Defendant's specific claim that trial counsel was ineffective in not objecting to a portion of the prosecutor's argument and his appellate counsel was ineffective in not raising the particular issue on appeal must fail for several reasons.

4. The propriety of the specific comment in fact was objected to by trial counsel and was raised on direct appeal as being an improper argument of future dangerousness. The Nevada Supreme Court decided that, though the argument was improper, Defendant was not prejudiced in light of the overwhelming evidence against him. *Castillo, supra*, at 279-80. Defendant now claims that trial counsel and appellate counsel should have objected to the same comment and appealed based on a new ground – that the comment was an improper "moral duty" argument, citing the newly-decided case of *Evans v. State*, 117 Nev. 609, 28 P.3d 498 (2001). Since the Nevada Supreme Court has already considered the

43

propriety of this exact argument on direct appeal, albeit on a different ground, the Nevada Supreme Court 's decision is considered law of the case. *Hall v. State*, 91 Nev. 314, 315, 535 P.2d 797, 798 (1975). A defendant may not "merely suppl[y] a more focused review of the issues stemming from the illumination of hindsight," as Defendant has done here. *Hogan v. Warden*, 109 Nev. 952, 959, 860 P.2d 710, 715 (1993).

5.      Additionally, *Evans* was decided in 2001, years after Defendant's trial and direct appeal which occurred in 1996 and 1998 respectively. Requiring trial and appellate counsel to predict a decision three years in the future runs afoul of the limitation that every effort must be made to eliminate the "distorting effects of hindsight" and to "evaluate the conduct under the circumstances and from counsel's perspective at the time" of the alleged ineffectiveness. *Evans*, *supra*; *Kirksey v. State*, 112 Nev. 980, 987-88, 9232 P.2d 1102, 1107 (1996). As such, it cannot be said that Defendant's trial or appellate counsel fell below an objective standard of reasonableness in failing to object or raise this issue on the cumulative "moral duty" ground.

6.      Also, in *Evans*, the penalty was reversed as a result of numerous instances of misconduct in the penalty phase argument, not simply due to the "moral duty" argument. In fact, the Nevada Supreme Court, in *Evans* noted that the "moral duty" argument, "considered alone perhaps they did not [prejudice the defendant], but the prosecutor erred further." *Evans*, *supra*, 29 P.3d at 515. Thus, because it cannot be said that had trial counsel or appellate counsel here raised the additional ground that the penalty here would have necessarily been overturned, Defendant has failed to demonstrate that the actions of his trial or appellate counsel caused him prejudice.

Findings of Fact, Conclusions of Law and Order, Respondents' Exh. 183, pp. 4-5 (ECF No. 93-24, pp. 5-6). On appeal, the Nevada Supreme Court affirmed the denial of the ineffective assistance of counsel claims, ruling as follows:

Castillo claims first that his appellate counsel was ineffective in challenging an improper argument by the prosecutor. On direct appeal, counsel contended that the prosecutor committed misconduct in arguing to the jurors that "you will be imposing a judgment of death and it's just a question of whether it will be an execution sentence for the killer of Mrs. Berndt or for a future victim of this defendant." [Footnote: *Castillo*, 114 Nev. at 279, 956 P.2d at 109.] This court considered the argument improper but not reversible error. [Footnote: *Id.* at 280-81, 956 P.2d at 109-10.] Castillo now complains that his counsel failed to also challenge a different aspect of the prosecutor's argument, regarding the jury's "duty." The prosecutor began the above remark by telling the jury that "[t]he issue is do you … have the resolve and the courage, the determination, the intestinal fortitude, the sense of commitment to do your legal and [m]oral duty." [Footnote: Trial Transcript (September 24, 1996, Afternoon Session) at 65; *cf. Castillo*, 114 Nev. at 179, 956 P.2d at 109.] In *Evans v. State*, this court condemned such rhetoric because it is "designed to stir the jury's passion and appeal to partiality." [Footnote: 117 Nev. at 633-34, 28 P.3d at 515.]

The district court incorrectly concluded that this issue was subject to the law of the case and deserved no consideration. Castillo's current claim is not simply a refinement of the original direct-appeal issue of prosecutorial misconduct; it is a claim of ineffective assistance of counsel, based, moreover, on a ground not raised on direct appeal. The doctrine of the law [of] the case therefore has no application here. [Footnote: *Cf. Hall v. State*, 91 Nev. 314, 325-16, 535 P.2d 797, 798-99 (1975).] The district court also concluded that because *Evans* was not decided until 2001, counsel could not be faulted for failing in 1998 to challenge the prosecutor's argument on the ground now raised. This is a relevant but not decisive consideration. It is obviously not necessary in all cases for this court to disapprove specific language before a defense counsel should reasonably object to such language. We conclude that appellate counsel acted unreasonably here in not raising this issue but conclude that no prejudice resulted.

In *Evans*, considering whether the prosecutor's improper remarks on the jury's "duty" deprived Evans of a fair penalty hearing, we stated that "perhaps they did not, but the prosecutor erred further." [Footnote: 117 Nev. at 634, 28 P.3d at 515.] Based primarily on that further error (the prosecutor urged the jury to prematurely consider character evidence in reaching a verdict of death), we granted Evans a new penalty hearing. [Footnote: *Id.* at 634-37, 28 P.3d at 515-17.] We conclude that the improper argument in this case did not deprive Castillo of a fair penalty hearing. The aggravating circumstances and the other evidence presented against Castillo relevant to his sentence were of such force that the result of his appeal would not have changed even if counsel had challenged the improper argument on both grounds. [Footnote: Castillo's attorney, Christopher R. Oram, accuses this court of "reverse discrimination" because on direct appeal we did not grant a new penalty hearing for Castillo, based on this improper argument, as we did for Evans. Castillo apparently is white, and Evans apparently is African-American. This accusation is nonsense. First, the race of the parties before this court has no bearing on our decisions. Second, Castillo did not raise this issue on direct appeal, so this court has not had a proper opportunity to address it before. Third, the primary error that occurred in Evans's case – a prosecutor urging the jury to employ improperly the character evidence – did not occur here. We advise Mr. Oram to refrain from making reckless, unfounded accusations in the future.]

Order of Affirmance, Respondents' Exh. 198, pp. 4-6 (ECF No. 94-15, pp. 5-7).

To prevail on a claim of prosecutorial misconduct a habeas petitioner must show that the misconduct "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986). The first issue is whether the prosecutor's remarks were improper; if so, the next issue is whether the remarks infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005) (citing *Darden*, 477 U.S. at 181).

45

A prosecutorial misconduct claim is decided by "examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir.1995) (internal quotation marks omitted).

This Court determines that the Nevada Supreme Court reasonably concluded that the argument of the prosecutor at issue here – asking the jurors to choose between executing Castillo or an innocent future victim, and suggesting that the jury had a moral duty to impose the death penalty – was improper but did not so infect the trial with unfairness as to render Castillo's sentence a denial of due process. The essence of the prosecutor's argument was that Castillo would pose a danger in the future, and there was ample evidence presented in the penalty phase of Castillo's trial to support that point. While the prosecutor's argument was improper, it did not mischaracterize evidence, and, in this Court's view, was not so egregious as to violate Castillo's constitutional right to due process of law.

With respect to the claim that trial counsel was ineffective, the record reflects that trial counsel did object, and the objection was ultimately overruled. Castillo does not make any showing that his trial counsel could have done more. The state courts reasonably denied the claim of ineffective assistance of trial counsel.

And, also with respect to the claim that Castillo's appellate counsel was ineffective vis-à-vis this claimed prosecutorial misconduct, the Court determines that the state courts reasonably denied relief. Castillo's appellate counsel did raise an issue regarding the prosecutor's argument on Castillo's direct appeal, albeit focusing on the prosecutor's argument that the jury must choose between executing Castillo or an innocent future victim, rather than the prosecutor's argument that the jury had a moral duty to impose the death penalty. The two arguments were closely related; indeed, the Nevada Supreme Court's decision on Castillo's direct appeal included a quotation of both arguments, in a single sentence. *See* Opinion, Respondents' Exh. 112, p. 10 (ECF No. 91-14, p. 11). This Court agrees with the Nevada Supreme Court, that there is no

1   reasonable probability that the outcome of Castillo's direct appeal would have been

2   different had his counsel on his direct appeal framed the argument differently. The state

3   courts' denial of relief on the claim of ineffective assistance of appellate counsel was

4   reasonable.

5        The Court will deny relief on Claim 7(II)(C).

6   Claim 8(II)(A)

7        In the remaining part of Claim 8(II)(A), Castillo claims that his federal

8   constitutional rights were violated because the prosecution introduced irrelevant and

9   prejudicial victim impact evidence – "a photograph of the victim and her granddaughter

10  at the granddaughter's graduation" (ECF No. 126, p. 168) – during the guilt phase of

11  his trial. *See* Second Amended Petition (ECF No. 126), pp. 167-69; Order entered

12  March 2, 2016 (ECF No. 184), pp. 52-53.

13       Castillo asserted this claim on his direct appeal and the Nevada Supreme Court

14  ruled as follows:

15           … Castillo contends that admission of a family photograph and
             autopsy photographs depicting Berndt amounted to impermissible victim
16           impact evidence. Castillo contends that the prejudicial effect of these
             photographs substantially outweighed their probative value.
17
             The admissibility of photographs is within the sound discretion of
18       the district court. *Greene v. State*, 113 Nev. 157, 167, 931 P.2d 54, 60
         (1997). It is within the district court's discretion to exclude photographs
19       when their prejudicial effect substantially outweighs their probative value.
         *Id.*
20
             We conclude that the family photograph was relevant on the issue
21       of Berndt's identity and accurately depicted her six months prior to the
         killing; this photograph also provided a comparison with her appearance in
22       the autopsy photographs. Accordingly, we conclude that the probative
         value of the family photograph outweighed its prejudicial effect this the
23       district court did not abuse its discretion by admitting it.

24  Opinion, Respondents' Exh. 112, pp. 8-9 (ECF No. 91-14, pp. 9-10).

25       "A habeas petitioner bears a heavy burden in showing a due process violation

26  based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir.

27  2005), as amended, 421 F.3d 1154 (9th Cir. 2005). "'The admission of evidence does

28  not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in

violation of due process.'" *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (citations omitted); *Gonzalez v. Knowles*, 515 F.3d 1006, 1011 (9th Cir. 2008). "Only if there are *no* permissible inferences the jury may draw from evidence can its admission violate due process." *Alcala v. Woodford*, 334 F.3d 862, 887 (9th Cir. 2003) (emphasis in original); *Houston v. Roe*, 177 F.3d 901, 910 n.6 (9th Cir. 1999).

Castillo does not, in Claim 8(II)(A) (ECF No. 126, pp. 167-69) or in his argument in his reply regarding the claim (ECF No. 195, pp. 114-20), cite to a copy of the subject photograph in the record. For this reason alone, in the Court's view, Castillo fails to meet his burden on this claim.

Moreover, accepting Castillo's description of the photograph for purposes of analysis, this claim is without merit. Such evidence does not approach the standard for a due process violation. Castillo does not cite any federal precedent remotely supporting the proposition that the introduction of such evidence is a constitutional violation. The state courts' ruling, denying relief on this claim, was not unreasonable. The Court will deny habeas corpus relief with respect to Claim 8(II)(A).

Claim 8(IV)

In Claim 8(IV), Castillo claims that his federal constitutional rights were violated because the prosecution introduced unduly prejudicial victim impact testimony during the penalty phase of his trial. *See* Second Amended Petition (ECF No. 126), pp. 169-72. Specifically, Castillo challenges the admission of the penalty-phase testimony of Jean Marie Hosking, the victim's daughter, and Lisa Keimach and Ronda LaLicata, the victim's granddaughters. *See id.*

Regarding the testimony of Jean Marie Hosking, Castillo claims:

Hosking relayed the following story:

> when she came home that night, she opened up her door and went in, had her dinner, watched a little t.v., and went to bed. And she always had a book beside her bed. She was always reading and I assumed had finished reading her story and took her glasses off, turned her light off, and went to sleep. And when she called and relayed this to me, it just scared me half to death. She felt this bump on her chest,

48

> and she came to, and it was a cat in her house that
> apparently had hidden in the closet or in a corner someplace
> until after she was asleep. And so she was awaken with
> quite a start. And I said at that time, if she had a weak heart,
> I don't know if she would have made it through that scare. It
> was quite scary.

Such testimony was not constitutionally permissible. Hosking's story, describing a time when the victim was awoken with "quite a start" was sufficiently similar to the circumstances of this offense and essentially encouraged Mr. Castillo's jury to infer the emotions which the victim experienced. [Reporter's Transcript, September 20, 1996, Respondents' Exh. 81, pp. 43-44 (ECF No. 90-11, p. 45 - ECF No. 90-12, p. 2).]

*Id.* at 170-71. Castillo also complains of Hosking's testimony regarding sympathy cards she received after her mother's murder. *See id.* at 171-72. Regarding the testimony of Lisa Keimach, who was Berndt's granddaughter, Castillo asserts:

> During Lisa Keimach's testimony, the prosecutor asked why she did not travel to Las Vegas immediately upon hearing of the victim's death. Keimach responded that she had "had a miscarriage the day before, and actually I was probably the last one to talk to my grandmother on the telephone, because I talked to her Saturday night and had a long conversation with her about that event. And I – you know, I was supposed to be on bed rest for quite [some time]." [Reporter's Transcript, September 20, 1996, Respondents' Exh. 81, p. 11 (ECF No. 90-11, p. 13).] These circumstances, surrounding Keimach's ability to travel to Las Vegas, bore no direct relation to the effect of this offense on Keimach, or her family, and invited the jury to base its verdict on sentiment.

*Id.* at 170. In his petition, Castillo does not make any specific claim regarding the testimony of Ronda LaLicata. *See id.* at 169-72.

Castillo asserted this claim on his direct appeal, and the Nevada Supreme ruled as follows:

> Castillo contends that testimony from Berndt's daughter and two granddaughters was unduly repetitive and constituted improper and cumulative victim impact evidence. Castillo contends that the district court's failure to limit "the nature and scope of this testimony to avoid the arbitrary and capricious entry of the death penalty" violated the Due Process Clause and the Nevada Constitution.
>
> The three victim impact witnesses were each related to Berndt. They testified about the quality of Berndt's life and the impact of her death upon themselves and other family members. They also spoke about periods of time they spent with Berndt. This court has previously concluded that similar testimony did not violate the defendant's constitutional rights. *See Wesley v. State*, 112 Nev. 502, 519-20, 916 P.2d 793, 804 (concluding that repetitive testimony of victim's three friends, two

49

of whom testified that the victim was a father figure in their lives, did not violate the defendant's constitutional rights). The policy underlying admission of victim impact evidence in penalty hearings strongly favors affirming the decision and penalty in the instant case. Furthermore, Castillo's position is untenable because it contradicts relevant case law and requires reinterpretation of the Nevada Constitution. Accordingly, we conclude that the district court did not abuse its discretion in permitting all three witnesses to testify.

Opinion, Respondents' Exh. 112, p. 13 (ECF No. 91-14, p. 14).

In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Supreme Court reconsidered its holdings in *Booth v. Maryland*, 482 U.S. 496 (1987), and *South Carolina v. Gathers*, 490 U.S. 805 (1989), that the Eighth Amendment prohibited a capital sentencing jury from considering "victim impact" evidence relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family. *See Payne*, 501 U.S. at 817. The *Payne* Court pointed out that "the assessment of harm caused by the defendant as a result of the crime charged has understandably been an important concern of the criminal law, both in determining the elements of the offense and in determining the appropriate punishment." *Id.* at 819. The Court commented as follows on victim impact evidence in capital sentencing proceedings:

> Payne echoes the concern voiced in Booth's case that the admission of victim impact evidence permits a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy. *Booth*, *supra*, 482 U.S., at 506, n. 8, 107 S.Ct., at 2534 n. 8. As a general matter, however, victim impact evidence is not offered to encourage comparative judgments of this kind – for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not. It is designed to show instead each victim's "uniqueness as an individual human being," whatever the jury might think the loss to the community resulting from his death might be.

*Id.* at 823. According to the *Payne* Court: "Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." *Id.* at 825. The Court continued:

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase

50

evidence of the specific harm caused by the defendant. "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Booth*, 482 U.S., at 517, 107 S.Ct. at 2540 (WHITE, J., dissenting) (citation omitted). By turning the victim into a "faceless stranger at the penalty phase of a capital trial," *Gathers*, 490 U.S., at 821, 109 S.Ct. at 2216 (O'CONNOR, J., dissenting), *Booth* deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.

*Id*. The Court concluded:

We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

*Id*. at 827. The *Payne* Court cautioned, however: "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief. *See Darden v. Wainwright*, 477 U.S. 168, 179-183, 106 S.Ct. 2464, 2470-2472, 91 L.Ed.2d 144 (1986)." *Id*. at 825.

The penalty-phase testimony of Jean Marie Hosking and Lisa Keimach was admissible victim-impact testimony, under *Payne*. It demonstrated that "the victim [was] an individual whose death represents a unique loss to society and in particular to his family," and it spoke to "the specific harm caused by the crime in question." *See id*. The testimony in question was not so unduly prejudicial as to render the trial fundamentally unfair, in violation of the Due Process Clause.

The Nevada Supreme Court's ruling on this claim, denying relief, was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. The Court will deny relief on Claim 8(IV).

1     Claim 9

2     In Claim 9, Castillo claims that his federal constitutional rights were violated

3 because the trial judge allowed the prosecutor to elicit testimony regarding other

4 criminal acts committed by Castillo. *See* Second Amended Petition (ECF No. 126),

5 pp. 174-76.

6     Castillo points out, as background for this claim, that he filed a pre-trial motion to

7 exclude evidence that at the time when he killed Berndt he needed money to pay

8 attorneys' fees for representation in a separate criminal case, and the trial court granted

9 the motion in part. *See id.* at 174. The trial court ruled as follows on the motion:

10     That the defendant had pending criminal matters and that he needed
    money to pay his attorney to handle such matters, that is granted in part at
11     the guilt phase except that the defendant's debts to the attorneys or the
    fact of that will be allowed at the guilt phase on the issue of motive.
12     Evidence of why the fees were incurred will, per the State's response, not
    be admitted.
13

14 Reporter's Transcript, August 12,1996, Respondents' Exh. 47, p. 3 (ECF No. 88-18,

15 p. 4).]

16     Castillo goes on to assert that the prosecution violated the trial court's order, and

17 violated his federal constitutional rights, by eliciting the following testimony from Harry

18 Kumma, Jr., who worked with Castillo:

19     Q.    Were you aware, in the latter part of November or
    December, of anything about Mr. Castillo's financial circumstances?
20

21     [Defense Counsel]:   Objection, your Honor, relevance.

    [Prosecutor]: Let me –
22

    The Court: Overruled.
23

    [Prosecutor]: Thank you.
24

    Q.    Let me be more blunt.
25

    Did he ever ask you to borrow money.
26

    A.    Yes, sir, on one occasion.
27

28     Q.    And without saying specifically what for, how much did he
    ask you for?

A.     I believe he needed to borrow $350, I believe, and –

Q.     Did he get the money from you?

A.     No, sir.

Q.     What did you tell Mr. Castillo?

A.     I really wasn't in a financial position to be lending any money to anybody.

Q.     And that's what you told him?

A.     Yes, sir.

(Off the record discussion not reported.)

Q.     (by [Prosecutor]) Did you understand that the money was to pay a lawyer?

[Defense Counsel]:  Objection, your Honor, relevance.

The Court:  Overruled.

The Witness:  I can't remember the exact conversation, but I was under the impression it was for another case that he had ongoing.

Reporter's Transcript, August 29,1996, Respondents' Exh. 61, pp. 77-79 (ECF No. 89-14, pp. 32-34); *see also* Second Amended Petition (ECF No. 126), pp. 174-75. The defense moved for a mistrial based on his testimony, and the trial court denied that motion. *See* August 29,1996, Respondents' Exh. 61, pp. 93-95 (ECF No. 89-14, pp. 48-50).

Castillo goes on to point out that the prosecutor mentioned this testimony in closing argument, as follows:

Connecting point number two, a motive to steal. By his conversations about the key, Mr. Castillo apparently had a motive to enter. The only reason for entering would be to take property. He told his girlfriend, Tammy Jo Bryant, he told Kirk Rasmussen on that fateful Monday, December the 18th, after this happened, and he told the police, "It was Christmas time. I was broke. I couldn't even get family members a tape or other things and I needed $350 to pay attorney's fees and the seed of the idea was put in my mind by my old lady," by Tammy Bryant, "because we were short of money and she didn't get a check, a little care package from friends like she had hoped to get," and you may remember, Harry Kumma testified that the defendant asked him for a three hundred fifty dollar loan to pay his attorney fees and Kumma didn't have it.

1   Reporter's Transcript, September 4,1996, Respondents' Exh. 75, p. 61 (ECF No. 90-2,

2   p. 17); *see also* Second Amended Petition (ECF No. 126), pp. 175-76.

3          Castillo contends that the witness' reference to "another case that he had

4   ongoing," implied that Castillo had engaged in prior criminal conduct. *See* Second

5   Amended Petition (ECF No. 126), p. 175. Castillo contends that that testimony, together

6   with the prosecutor's mention of the testimony in closing argument, violated his federal

7   constitutional rights.

8          Castillo raised this claim on his direct appeal, and the Nevada Supreme Court

9   ruled as follows:

10              … Castillo contends that the State improperly elicited testimony
        from Kumma indicating the subject of another case in which Castillo was
11      involved. The district court judge made a pretrial ruling barring admission
        of evidence of "why the fees [to his attorney] were incurred" but allowing
12      evidence of the fact of Castillo's debt to his attorney on the issue of
        motive. Despite this pretrial ruling, the district court permitted Kumma to
13      testify that Castillo was involved in "another case." Castillo contends that
        in light of its pretrial ruling, the district court abused its discretion by
14      allowing this testimony and erred in refusing to declare a mistrial on the
        basis of this admission.
15
              Our review of the challenged testimony reveals that the testimony
16      the prosecutor elicited from Kumma did not disclose the nature of the
        other case in which Castillo was involved, namely, whether it was criminal
17      or civil; thus, the prosecutor did not violate the district court's pretrial ruling
        on the matter. We conclude that even if Kumma's testimony was improper,
18      the inadvertent reference to Castillo's prior criminal conduct did not
        warrant a mistrial. Therefore, we conclude that the district court did not err
19      in refusing to declare a mistrial on this basis.

20  Opinion, Respondents' Exh. 112, pp. 9-10 (ECF No. 91-14, pp. 10-11).

21          The United States Supreme Court has not held that the introduction of evidence

22  of prior bad acts, or other evidence to show propensity to commit a crime, violates due

23  process. *See Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991) ("[W]e express no opinion

24  on whether a state law would violate the Due Process Clause if it permitted the use of

25  'prior crimes' evidence to show propensity to commit a charged crime."). Citing the

26  Supreme Court's express reservation of judgment on the issue, the Ninth Circuit Court

27  of Appeals has held that federal habeas corpus relief is unavailable based on a state

28  court's admission into evidence of prior bad acts or propensity evidence. *See Mejia v.*

54

*Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (rejecting habeas petitioner's challenge to introduction of propensity evidence because petitioner could point to no Supreme Court precedent establishing that admission of such evidence violated Constitution). Castillo does not point to any federal precedent supporting the proposition that the admission of prior bad acts or propensity evidence would be grounds for habeas corpus relief.

Approaching the claim more generally, as is discussed above regarding Claim 8(II)(A), "'[t]he admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process.'" *Holley*, 568 F.3d at 1101 (citations omitted); *Gonzalez*, 515 F.3d at 1011 (9th Cir. 2008). "Only if there are *no* permissible inferences the jury may draw from evidence can its admission violate due process." *Alcala*, 334 F.3d at 887 (emphasis in original); *Houston*, 177 F.3d at 910 n.6. The admission of the evidence at issue here does not approach this standard. The evidence was relevant. It suggested a motive for Castillo to rob Berndt; arguably, the nature of the legal proceeding – whether criminal or civil – had a bearing on the strength of Castillo's motivation. Furthermore, given that the evidence was ambiguous with respect to whether Castillo had previously committed any crime, it is questionable whether the evidence can even be considered prior bad acts or propensity evidence. The testimony in question did not render Castillo's trial so unfair as to violate his constitutional right to due process of law.

The Nevada Supreme Court was not unreasonable in concluding that the evidence in question did not render Castillo's trial fundamentally unfair. The Nevada Supreme Court's denial of relief on this claim was reasonable. This Court will deny Castillo habeas corpus relief on Claim 9.

Claim 11

In the remaining part of Claim 11, Castillo claims that his federal constitutional rights were violated because Nevada's deadly weapon enhancement statute was vague and over-broad. *See* Second Amended Petition (ECF No. 126), pp. 179-81; Order entered March 2, 2016 (ECF No. 184), pp. 54-55.

In the March 2, 2016 order, the Court determined that Castillo asserted this claim in his first state habeas action and that the Nevada Supreme Court ruled the claim procedurally barred, but that the Nevada Supreme Court did so under a state procedural rule that was not adequate to support application of the procedural default doctrine in this federal habeas action. *See* Order entered March 2, 2016 (ECF No. 184), pp. 54-55. This claim, then, remains to be adjudicated. And, as the state courts did not rule on the claim on its merits, this claim is subject to *de novo* review in this action; the standard prescribed by 28 U.S.C. § 2254(d) does not apply. *See Runningeagle v. Ryan*, 825 F.3d 970, 978 (9th Cir. 2016) ("Any federally reviewable claim that was not adjudicated on the merits in state court is reviewed *de novo*."); *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005).

The Court determines that Castillo's claim is meritless. The claim is fundamentally flawed, because Castillo's sentence was not affected by the finding that he used a deadly weapon in the course of the crimes.

Castillo alleges in Claim 11: "Mr. Castillo was sentenced to death for the First-degree Murder conviction and the trial judge sentenced Mr. Castillo to 180 months incarceration for the robbery, with an equal and consecutive term of 180 months, for the use of a deadly weapon during the robbery." Second Amended Petition (ECF No. 126), p. 179. But that allegation is belied by the record. Castillo was charged with, among other crimes, robbery of a victim sixty-five years or older, and murder with the use of a deadly weapon. *See* Indictment, Respondents' Exh. 4 (ECF No. 87-8); Amended Indictment, Respondents' Exh. 25 (ECF No. 87-29). The only charge with alleged use of a deadly weapon was the murder charge. *See id.* However, because Castillo was sentenced to death for the murder, the deadly weapon enhancement was not applied and had no effect on his sentence for the murder. *See* Judgment of Conviction, Respondents' Exh. 97 (ECF No. 90-31). As for the robbery, Castillo was also convicted of that crime, and his sentenced was enhanced, but it was enhanced because the victim was older than 65 years (she was 86 years old when she was murdered). The sentence

for the robbery was not enhanced because of the use of a deadly weapon. *See id.* Therefore, it is plain from the record that there simply was no deadly weapon enhancement applied in Castillo's sentencing. Castillo could not possibly have been prejudiced by the constitutional infirmity he alleges with respect to the deadly weapon sentence enhancement, and this claim is, consequently, wholly without merit.

The respondents made this point in their answer – explaining the flaw inherent in this claim. *See* Answer (ECF No. 189), pp. 59-61. Castillo did not reply to that argument in his reply; in fact, Castillo did not address Claim 11 at all in his reply. *See* Reply (ECF No. 195); *see also* Response to Reply (ECF No. 215), p. 41 ("Castillo does not address this ground in his reply.").

The Court will deny Castillo habeas corpus relief with respect to Claim 11.

Claim 13

In Claim 13, Castillo claims that his death sentence is invalid under the federal constitution because "Nevada's lethal injection scheme constitutes cruel and unusual punishment." *See* Second Amended Petition (ECF No. 126), pp. 179-81. As the court understands Claim 13, Castillo asserts both that lethal injection is unconstitutional in all cases – a general challenge – and that lethal injection, conducted in the manner in which Nevada authorities intend to conduct it in this case, would be unconstitutional – an as-applied challenge. *See id.*

In the March 2, 2016 order, the Court determined that Castillo asserted this claim in his first state habeas action and that the Nevada Supreme Court ruled the claim procedurally barred, but that the Nevada Supreme Court did so under a state procedural rule that was not adequate to support application of the procedural default doctrine in this federal habeas action. *See* Order entered March 2, 2016 (ECF No. 184), p. 56. This claim, then, remains to be adjudicated. And, as the state courts did not rule on the claim on its merits, this claim is subject to *de novo* review in this action; the standard prescribed by 28 U.S.C. § 2254(d) does not apply. *See Runningeagle*, 825 F.3d at 978; *Chaker*, 428 F.3d at 1221.

Castillo's general challenge to the constitutionality of lethal injection as a means of conducting his execution is a claim that lethal injection is in all cases unconstitutional, and that the respondents cannot possibly carry out his execution in a constitutional manner. This general challenge to lethal injection is meritless in view of United States Supreme Court precedent. In *Baze v. Rees*, 553 U.S. 35 (2008), the Supreme Court, on an appeal from a judgment in a civil rights action, ruled Kentucky's lethal injection protocol to be constitutional. The *Baze* holding forecloses the argument that lethal injection, no matter how administered, is necessarily unconstitutional. *Baze* demonstrates that lethal injection can be administered in a manner that does not constitute cruel and unusual punishment in violation of the Eighth Amendment. Castillo's general challenge to the constitutionality of lethal injection fails for this reason, and that part of Claim 13 will be denied.

Turning to Castillo's as-applied challenge, the Court determines that such a challenge to Nevada's execution protocol is not cognizable in this federal habeas corpus action.

In *Nelson v. Campbell*, 541 U.S. 637 (2004), a state prisoner sentenced to death filed a civil rights action, under 42 U.S.C. § 1983, alleging that the state's proposed use of a certain procedure, not mandated by state law, to access his veins during a lethal injection would constitute cruel and unusual punishment. The Supreme Court reversed the lower courts' ruling that the claim sounded in habeas corpus and could not be brought as a section 1983 action. The Supreme Court ruled that section 1983 was an appropriate vehicle for the prisoner to challenge the lethal injection procedure prescribed by state officials. *Nelson*, 541 U.S. at 645. The Court stated that the prisoner's suit challenging "a particular means of effectuating a sentence of death does not directly call into question the 'fact' or 'validity' of the sentence itself [because by altering the lethal injection procedure] the State can go forward with the sentence." *Id.* at 644. In *Hill v. McDonough*, 547 U.S. 573 (2006), the Court reaffirmed the principles articulated in *Nelson*, ruling that an as-applied challenge to lethal injection was properly

brought by means of a section 1983 action. *Hill*, 547 U.S. at 580-83. Both *Nelson* and *Hill* suggest that a section 1983 claim is the more appropriate vehicle for an as-applied challenge to a method of execution. *See also Glossip v. Gross*, 135 S.Ct. 2726, 2738 (2015) ("In *Hill*, the issue was whether a challenge to a method of execution must be brought by means of an application for a writ of habeas corpus or a civil action under § 1983. We held that a method-of-execution claim must be brought under § 1983 because such a claim does not attack the validity of the prisoner's conviction or death sentence.") (citations to *Hill* omitted).

Given the amount of time that passes, after the judgment of conviction becomes final, before a death sentence is carried out, it is certainly possible – and perhaps likely – that a state's execution protocol will change after the judgment is entered imposing the death sentence. In this Court's view, habeas corpus law and procedure have not developed, and are unsuited, for the adjudication of such an issue. This Court determines that an as-applied challenge to a method of execution is not in the nature of a challenge to the constitutionality of the petitioner's custody or sentence. *See* 28 U.S.C. § 2254. Rather, an as-applied challenge to a method of execution is more akin to a suit challenging the conditions of custody, which must be brought as a civil rights action under 42 U.S.C. § 1983. The Court rules, then, that the as-applied challenge in Claim 13 is subject to dismissal, without prejudice, as not cognizable in this federal habeas corpus action.

The Court will deny Claim 13 to the extent that it asserts a general challenge to the constitutionality of lethal injection as a means of capital punishment, and the Court will dismiss Claim 13, without prejudice, to the extent that it asserts an as-applied challenge, that is, a challenge to the specific lethal injection protocol that would be used to execute Castillo.

Claim 16

In Claim 16, Castillo claims that his federal constitutional rights were violated because of the arbitrariness of Nevada's capital sentencing scheme. *See* Second Amended Petition (ECF No. 126), p. 216. The only somewhat specific factual allegation in Claim 16 is the following:

> As a result of plea bargaining practices, and imposition of sentences by juries and three-judge panels, sentences of less than death were imposed for offenses which are more aggravated than the one for which Mr. Castillo was convicted, and in situations where the mitigating evidence was less persuasive than that which exited in Mr. Castillo's case.

*Id.*

The Court determines that Castillo's Claim 16, as set forth in his second amended petition, does not state a viable claim for habeas corpus relief. Castillo does not state sufficient factual detail to fairly enable the respondents to answer the claim. Rule 2(c) of the Rules Governing Habeas Corpus Cases requires the habeas petitioner to "specify all the grounds for relief available to [him]" and to "state the facts supporting each ground." "It is well-settled that '[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.'" *Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995) (quoting *James v. Borg*, 24 F.3d 20, 26 (9th Cir.1994)).

Furthermore, and at any rate, capital punishment schemes similar to Nevada's generally have been held to be constitutional. *See Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988). And, the Supreme Court has held that, absent a showing that a system operated in an arbitrary and capricious manner, a petitioner "cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did not receive the death penalty." *McCleskey v. Kemp*, 481 U.S. 279, 306-07 (1987) (emphasis in original); *see also Pulley v. Harris*, 465 U.S. 37, 50-51 (1984) ("There is ... no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it."); *Beardslee v. Woodford*, 358 F.3d 560, 579–80 (9th Cir.2004) (rejecting argument that "different sentences for equally culpable co-

defendants violate the prohibition against arbitrary imposition of the death penalty"); *Ceja v. Stewart*, 97 F.3d 1246, 1252 (9th Cir.1996) ("There is no federal right to proportionality review...."); *Martinez–Villareal v. Lewis*, 80 F.3d 1301, 1308 (9th Cir.1996) (same).

In his reply, Castillo adds new allegations to this claim, significantly changing the focus and nature of the claim. *See* Reply (ECF No. 195), pp. 126-35. In his reply, Castillo argues that Nevada's capital punishment scheme fails to sufficiently narrow the class of death eligible defendants, grants the Nevada Supreme Court unfettered discretion, and lacks a reliable clemency mechanism; these assertions are not found in the claim as stated in Castillo's second amended petition. *See id.* The Court does not consider the new allegations and arguments that Castillo seeks to add to this claim for the first time in his reply. *See Delgadillo v. Woodford*, 527 F.3d 919, 930 n.4 (9th Cir. 2008) ("Arguments raised for the first time in [habeas] petitioner's reply brief are deemed waived."); *Moore v. Chrones*, 687 F. Supp. 2d 1005, 1033 (C.D. Cal. 2010) ("[i]t is improper to attempt to change the substance of a claim through a traverse and to assert ... a new claim distinct from that alleged in the original petition") (citing *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994)).

In the March 2, 2016 order, the Court determined that Castillo asserted this claim in his first state habeas action and that the Nevada Supreme Court ruled the claim procedurally barred, but that the Nevada Supreme Court did so under a state procedural rule that was not adequate to support application of the procedural default doctrine in this federal habeas action. *See* Order entered March 2, 2016 (ECF No. 184), p. 57. Therefore, as the state courts did not rule on this claim on its merits, it is subject to *de novo* review in this action; the standard prescribed by 28 U.S.C. § 2254(d) does not apply. *See Runningeagle*, 825 F.3d at 978; *Chaker*, 428 F.3d at 1221.

The Court determines that Claim 16 does not state a viable claim for habeas corpus relief and will, accordingly, deny Castillo relief on Claim 16.

<u>Claim 18</u>

In the remaining part of Claim 18, Castillo claims that his federal constitutional rights were violated because, in the penalty phase of his trial, the trial judge, in instructions to the jury, limited the jury's consideration of Castillo's theory of mitigating factors. *See* Second Amended Petition (ECF No. 126), pp. 225-27; Order entered March 2, 2016 (ECF No. 184), p. 58. In this claim, Castillo acknowledges that the trial court instructed the jury regarding relevant mitigating circumstances specifically recognized in NRS § 200.035, and also instructed the jury, pursuant to that statute, that it was to consider "any other mitigating circumstances." *See id.* at 225. Castillo contends, however, that the trial judge erred, and violated his constitutional rights, by not instructing the jury to consider certain non-statutory mitigating circumstances, those being that Castillo admitted his guilt of the offense, that he demonstrated remorse, that he cooperated with the police after he was identified as a suspect, that he did not plan to commit the murder, and that he had a difficult childhood. *See id.*

The trial court denied Castillo's request to instruct the jury regarding the non-statutory mitigating circumstances, finding that to do so would amount to improper commentary on the evidence, and that the catchall instruction – to consider "any other mitigating circumstances" – was sufficient, in that it allowed the defense to make argument regarding the non-statutory mitigating circumstances in closing argument. *See* Reporter's Transcript, September 24, 1996, Exh. 82, pp. 54-57 (ECF No. 90-15, pp. 26-29); *see also* Petitioner's Exh. 25 (ECF No. 128-5, p. 89) (Castillo's proposed instruction).

Castillo asserted this claim on his direct appeal, and the Nevada Supreme Court ruled on it as follows:

> Castillo contends that the district court erred in refusing to instruct the jury regarding five nonstatutory mitigating circumstances.
>
> At the penalty phase, the district court approved the defense's request to give jury instructions as to three statutory mitigating circumstances: the youth of the defendant, that the murder was committed while the defendant was under the influence of extreme mental or

emotional disturbance, and "any other mitigating circumstances." The district court denied the defendant's request to instruct the jury separately on five nonstatutory mitigating circumstances, namely, that the defendant: (1) has admitted his guilt of the offense charged, (2) has demonstrated remorse for the commission of the offense, (3) cooperated with police after he was identified as a suspect, (4) had not planned to commit the murder, and (5) had a difficult childhood.

This court reviews a district court's refusal to give a proposed nonstatutory mitigating jury instruction for an abuse of discretion, or judicial error. *Howard v. State*, 102 Nev. 572, 578, 729 P.2d 1341, 1345 (1986) ("*Howard I*"). Castillo cites *Lockett v. Ohio*, 438 U.S. 586 (1978) in support of his argument. There, a four-justice plurality of the United States Supreme Court conclude that a death penalty statute entirely precluding the sentence from considering as a mitigating factor any aspect of the defendant's character or record violates the Eighth and Fourteenth Amendments. *Id.* at 606-08. In *Boyde v. California*, 494 U.S. 370, 380-86 (1990), however, the Court determined that a mitigating circumstances instruction similar to the Nevada "catchall" provision satisfied constitutional standards.

Here, the district court instructed the jury to consider three mitigating circumstances, including the "catchall" provision. The jury returned a verdict of death after finding four aggravating circumstances and three mitigators. Clearly, the jury considered the mitigating circumstances. Thus, we concluded that the district court properly refused to give Castillo's proposed instructions on the grounds that they would have amounted to inappropriate comment on the evidence by the court and that Castillo was free to argue these outside factors under the "catchall" mitigation instruction.

Opinion, Respondents' Exh. 112, pp. 14-15 (ECF No. 91-14, pp. 15-16).

Castillo argues that the Nevada Supreme Court's ruling was contrary to, or an unreasonable application of, *Hitchcock v. Dugger*, 481 U.S. 393 (1987). *See* Reply (ECF No. 195), pp. 142-43. In *Hitchcock*, the Supreme Court held there to be constitutional error where an advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of non-statutory mitigating circumstances. *Hitchcock*, 481 U.S. at 398-99. The Court stated:

We have held that in capital cases, "'the sentencer'" may not refuse to consider or "'be precluded from considering'" any relevant mitigating evidence. *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 114, 102 S.Ct. 869, 876, 71 L.Ed.2d 1 (1982)). *See also Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (plurality opinion)

*Hitchcock*, 481 U.S. at 394.

The Court finds Castillo's argument in this regard to be without merit. The jury instructions in this case did not preclude the jury from considering that non-statutory mitigating circumstances asserted by Castillo. The catchall provision adequately informed the jury that those alleged mitigating circumstances could be considered.

Moreover, the Supreme Court held a similar catchall provision, and a jury instruction given under it, to be constitutional in *Boyde v. California*, 494 U.S. 370 (1990). In that case, the defendant presented extensive testimony of favorable character despite childhood disadvantages. *See Boyde*, 494 U.S. at 380-83. It was understood that the jury could consider that evidence only under the catchall provision, and the question was whether an instruction to consider "[a]ny other circumstance which extenuates the gravity of the crime" adequately informed the jury that character could be considered such a circumstance. *See id.* The Court examined "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.* at 380. A majority of the Court concluded that there was no showing that any ambiguity in the instruction precluded the jury from considering the character evidence. *See id.* at 383-85. This issue, in this case, is controlled by *Boyde*. Castillo makes no showing that the instruction given by the trial court, regarding application of the catchall provision, was ambiguous, such that there is a reasonable likelihood that the jury was precluded from considering his non-statutory mitigating circumstances. There was no constitutional violation.

The Nevada Supreme Court's denial of relief on this claim was not contrary to, or an unreasonable application of *Hitchcock*, or *Boyde*. The Court will deny Castillo habeas corpus relief on Claim 18.

Claim 19

In Claim 19, Castillo claims that his constitutional rights were violated "due to the cumulative errors in his trial, appeal and state post-conviction proceedings and the

1   systematic deprivation of [his] right to the effective assistance of counsel." Second

2   Amended Petition (ECF No. 126), p. 228.

3          As is discussed above, the Court finds no constitutional error. Therefore,

4   Castillo's claim of cumulative error in Claim 19 is of no moment, and the Court will deny

5   Castillo habeas corpus relief with respect to Claim 19.

6          Certificate of Appealability

7          The standard for the issuance of a certificate of appealability requires a

8   "substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c). The

9   Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

10                 Where a district court has rejected the constitutional claims on the
                   merits, the showing required to satisfy § 2253(c) is straightforward:  The
11                 petitioner must demonstrate that reasonable jurists would find the district
                   court's assessment of the constitutional claims debatable or wrong.
12

13  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074,

14  1077-79 (9th Cir. 2000).

15         The Court finds that, applying the standard articulated in *Slack*, a certificate of

16  appealability is warranted with respect to Claim 1(I)(B), Castillo's claim that his federal

17  constitutional rights were violated because of ineffective assistance of counsel as a

18  result of his trial counsel's failure to present a psychological defense in the guilt phase

19  of his trial, and with respect to the issue of the cognizability in this habeas action of the

20  as-applied challenge to the constitutionality of lethal injection as a method of execution

21  in Claim 13. The Court will grant Castillo a certificate of appealability on those two

22  claims. Regarding the remainder of Castillo's claims, the Court will deny him a

23  certificate of appealability.

24  Conclusion

25         **IT IS THEREFORE ORDERED** that, pursuant to Federal Rule of Civil Procedure

26  25(d), the Clerk of the Court shall substitute William Gittere, for Timothy Filson, on the

27  docket for this case, as the respondent warden.

28

**IT IS FURTHER ORDERED** that Claim 13 of the petitioner's second amended habeas petition (ECF No. 126) is dismissed, without prejudice, to the extent the petitioner claims that execution by lethal injection, as it would be carried out by the respondents in his case, is unconstitutional.

**IT IS FURTHER ORDERED** that all the remaining claims in the petitioner's second amended habeas petition, which are Claims 1(I)(B), 2, 3(I)(A), 3(II)(C), 7(II)(C), Claim 8(II)A) (the remaining part), 8(IV), 9, 11 (the remaining part), 13 (the remaining part, which is a general constitutional challenge to lethal injection), 16, 18 (the remaining part), and 19, are **DENIED**.

**IT IS FURTHER ORDERED** that the petitioner is granted a certificate of appealability with respect to Claim 1(I)(B), his claim that his federal constitutional rights were violated because of ineffective assistance of counsel as a result of his trial counsel's failure to present a psychological defense in the guilt phase of his trial, and with respect to the issue of the cognizability in this habeas action of the as-applied challenge to the constitutionality of lethal injection as a method of execution in Claim 13. With respect to all other claims in Castillo's second amended habeas petition, the Court denies a certificate of appealability.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly.

Dated this 14th day of January, 2019.

ROBERT C. JONES,
UNITED STATES DISTRICT JUDGE